WOJAHN, Appellant, vs. NATIONAL UNION BANK OF OSHKOSH, Respondent.

*January 11—January 31, 1911.*

*Reference: When proper: Presumption on appeal: Findings of referee, when to be affirmed: Evidence: Preponderance: Contracts: Implied promise to pay for services: Banks and banking.*

1. Where the record does not show what proofs were produced in support of a motion to refer, it will be presumed on appeal that a case was made warranting the order of reference, if the character of the action was such that it might be referred under any circumstances.
2. Findings of a referee appointed to hear, try, and determine a case should not, when reviewed by the circuit court, be treated from an original standpoint, but should have the same force and significance that findings of a trial court have upon review in this court. They should be affirmed unless contrary to the clear preponderance of the evidence, due weight being given to the superior advantages which the referee has for discovering the truth. This means that, ordinarily, such findings should not be disturbed unless manifestly so contrary to the evidence as to be really unexplainable except upon the theory that wrong rules of law were applied or material evidence wholly overlooked or a perverted view taken of the case.
3. The preponderance of evidence is not to be determined by merely taking account of the number of persons testifying on each side.
4. If a person performs valuable services for another at that other's request, the law implies, as a matter of fact, the making of a promise by the latter and its acceptance by the former to pay the one performing the services the reasonable value thereof.

5. If one merely accepts services from another which are valuable to him, the presumption arises, in general, that such services are to be paid for, and the burden of rebutting such presumption is upon the recipient; but such burden is more easily lifted than when the services are rendered by request.

6. When the referee or court has found the facts from which the law implies the promise and its acceptance, it is unnecessary, though not improper, to find in terms that the parties made a contract by implication.

7. The existence of an implied contract need not be shown by undisputed evidence, but may be established by the preponderance of conflicting evidence.

8. Findings of a referee to the effect that plaintiff, by request of the cashier of the defendant bank and with the knowledge and approval of its officers and directors, rendered services for it in supervising the management and financial affairs of a 'mercantile corporation, for the purpose of protecting defendant and insuring repayment to it of moneys which it had loaned to said corporation, and that such services, covering a period of five and one-half years, were reasonably worth a certain sum, are *held* not to have been so contrary to the clear preponderance of the evidence as to justify the trial court in disturbing them.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

Action to recover on contract.

Plaintiff's claim, duly put in issue, was that he performed valuable services, covering a period of some five years and a half, for defendant at its request in supervising a mercantile business, in collecting some $25,000 for defendant; that the reasonable value of such services was $5,000, and that no part thereof had been paid, except $125.

The cause was, in due form, referred to John Harrington to hear, try, and determine. The order of reference, as appears by recitals therein, was grounded on satisfactory proof that the trial would involve an examination of a long account.

The situation developed before the referee was substantially this: In 1901, C. L. Brownell & Co., a mercantile partnership, had its place of business at Split Rock, some three miles from Tigerton, this state, which latter place was located

within a short distance of Oshkosh, the home of the defendant. The business at Split Rock was important to the community and especially to any bank located at Tigerton, and that place, in a financial way, was tributary to Oshkosh. To promote defendant's business the officers and stockholders thereof caused a bank to be established at Tigerton under the name of the First National Bank of that place. Such stockholders and officers took a controlling interest. Defendant's president became president of the new bank and R. H. Hackett, cashier of the former, became vice-president of the latter. Through Mr. Hackett plaintiff was given the office of cashier of the Tigerton bank and was enabled to become a stockholder therein. Immediately after organization thereof C. L. Brownell & Co. commenced doing its banking business therewith. After about two years the firm was succeeded by a corporation under the name of the C. L. Brownell Company. After the corporation continued the business for about three years some changes in stockholders and officers occurred, new capital was taken in, and the name was changed to M. A. Sorley Company under which it was continued during the balance of the time material to this case. The business conducted by the company, from first to last, was important to the Tigerton bank. All the company's banking business was done there and some of its stockholders were stockholders of the bank. The company became a debtor of the bank to the extent the institution could well loan money to one borrower, and so far as the company otherwise needed credit it was mainly accommodated through defendant, which was under the active management of Mr. Hackett. The relations between the two banks were such that they were mutually interested in the affairs of the Brownell Company, that of the Tigerton bank being in some respects the greater and that of defendant being for some reasons the greater. In 1901 the company procured from defendant a loan of $15,000. Application therefor to plaintiff at the Tigerton bank was referred

to Mr. Hackett as cashier of defendant. At this time and thereafter, during all the period material to this case, the company, the Tigerton bank, and defendant were quite closely affiliated; in all transactions in regard to financial matters the line of communication from the company to the defendant being, in the main, through the Tigerton bank. Mr. Hackett, acting for defendant, accepted the application of the company for a loan of $15,000. He took its notes with mortgage security running to himself, in form, as a personal matter, but in fact to hold as trustee for defendant and any other party that might become interested in the indebtedness. The entire sum was advanced by the bank, the notes being turned over to it by Hackett. Later, Hackett, quite independently of plaintiff and as cashier of defendant, with a view of protecting the first loan and the mutual interests of the two banks, advanced to the company the additional sum of $10,000, taking notes and securities as before. This was regarded by Hackett as defendant's matter. Most of the notes were retained by it. He administered the matters appertaining to the entire indebtedness of $25,000 from first to last as a bank affair of defendant, although it did not retain all the paper. Security by way of indorsement was in time obtained upon $5,000 of the paper.

The securities running to Hackett consisted of real and chattel mortgages covering substantially all assets of the company. The incumbrances rendered the company quite incapable of doing business on a credit basis outside the circle controlled by the two banks and according to their pleasure. Such securities were controlled by Hackett and his successor in the interest of the $25,000 of indebtedness, except as realized on, till the last of the loans were paid. Some little time after all the indebtedness accrued, Mr. Hackett and plaintiff became much disturbed respecting the financial affairs of the company. They were of the opinion that unless its business should be conducted with great care it might be forced into

bankruptcy, in which event defendant might probably lose a large amount as it held the greater part of the two loans mentioned. To guard against that danger and because of the connection of defendant with the entire Brownell indebtedness, secured by the securities running to Hackett, he, acting for defendant, conceived the idea of having a representative of the holders of such indebtedness, particularly of defendant,. supervise the company's affairs. The idea was carried out,. plaintiff, at Hackett's request, undertaking the task. For a considerable length of time, in doing such work, he visited Split Rock several times a week after banking hours. In time the work required was less but he continued in some capacity and to some extent as supervisor of the company's affairs till the entire indebtedness was paid. He early concluded that he could not efficiently perform his work without being a stockholder and officer of the company and so advised Mr. Hackett. It was thereupon agreed that he should procure a controlling interest in the stock and that Hackett, as cashier of the bank,. should aid by loaning the necessary money. Pursuant thereto the stock was purchased, half being placed in the name of plaintiff and half in the name of Mrs. Brownell, and $1,250 being loaned to each to pay for the property at the rate of twenty cents on the dollar. The stock was put into a voting trust composed of three persons, two being Hackett and the plaintiff, and it was agreed that a majority of the trustees might vote the entire trust stock and so control the policy of the company.

After taking the stock plaintiff was made an officer of the company and allowed by it a salary of $200 per year for a time and after that of $150 per year for a few months. He received in all $367.47 for services rendered the company. For the purpose of giving the company credit standing Mr. Hackett released his chattel mortgage on its assets under an agreement that it might be reinstated at any time upon a vote in favor thereof of a majority of the voting trustees.

From first to last plaintiff did not render any bill to defendant for services, nor did he make any specific claim or substantial demand till this action was commenced. He received from defendant $125. The circumstances in relation thereto were disputed. He claimed that about 1905 there was some talk about his being furnished a horse or a horse and buggy to enable him to more conveniently and efficiently perform his work of looking after the company's affairs, and that he finally informed defendant he would take $125 instead of being so furnished, and it was accordingly paid him. On behalf of defendant there was testimony of there having been talk about a horse and buggy, but that $125 was, in the end, paid in settlement of any claim plaintiff had against defendant. Plaintiff continued to supervise the company's affairs after he received the $125, exercising controlling authority in that regard, in some capacity, till the last of the indebtedness to defendant was paid, which occurred in 1908.

Till Mr. Hackett severed his connection with defendant in 1905, he and plaintiff worked together in regard to the company's affairs, to the end that the indebtedness, particularly the large amount due defendant, might finally be paid. Plaintiff, as stated, continued till full payment was secured. At last he negotiated a loan for the company, becoming a surety himself, by which the last of the indebtedness was paid. He did not buy the stock with much, if any, expectation of profiting thereby. The thought was rather that there might be a loss, so Mr. Hackett encouraged him to take the risk thereof with such chance as there might be for profit by binding himself to stand one half the loss, in case of there being any. After efficiently promoting the company's business for some time and to such extent that the danger of loss to creditors was largely reduced, plaintiff sold his stock but shortly afterward, in order to further promote the purpose of his supervision, he repurchased the same. A few months later he again sold, leaving the company at that time in a fairly safe

condition.   He did not make any gain out of the ownership
of stock.   If anything there was a loss of a small amount.
His administration was taken, as stated, at the request of
Mr. Hackett, acting for defendant, and was continued to the
end with the knowledge of its officers.   For the first two years
or more the work of supervision required almost daily atten-
tion.   Thereafter the labor was less.   His services were quite
valuable, especially to defendant.   Such special value the evi-
dence tends to prove was around $300 per year on the average.
As to whether he was promised compensation therefor the evi-
dence was in sharp conflict.   He testified that he was so prom-
ised by Mr. Hackett and by each of two other officers of the
bank.   His testimony as to each of such persons was con-
tradicted. . Hackett, while testifying to having officially re-
quested plaintiff to render the services and that they were val-
uable to defendant, said he did not at any time promise plaint-
iff compensation or think of the matter of defendant having to
compensate him or of his having expectation of receiving com-
pensation other than such as he might receive from the com-
pany or by way of benefits on account of his connection with
the Tigerton bank.

The referee found, as regards vital matters, these as facts:

1. During the year 1901 defendant loaned $25,000 to the
C. L. Brownell Company;

2. In 1901 and 1902 it seemed to the cashier of defendant
that the company's business was being poorly managed and
that its affairs were in such condition as to menace defendant
with serious danger of sustaining a large loss by reason of
having extended credit as stated;

3. In 1902, plaintiff, by request of Hackett as cashier of
defendant and with the knowledge and approval of its officers
and directors, performed services for it in respect to the afore-
said indebtedness, counseling as to its management under the
advice of Hackett, assisting in collecting the company's cred-
its and conserving its assets, visiting its office several times a

week after business hours, spending portions of afternoons and evenings there, making numerous trips to Oshkosh to consult with defendant's officers and, generally, in supervising the company's financial affairs;

4. In aid of rendering the aforesaid efforts efficient to protect defendant's interest, plaintiff, at the request and through the assistance of Hackett as cashier of defendant, became a stockholder and officer of the company, and, as such, received from it $20 a month for about two years. He also received during the period of his service $125 from defendant, either to apply on services or expenses, or both;

5. The loans of defendant to the Brownell Company were all eventually paid with interest;

6. Plaintiff's services in securing such payment were rendered by request of defendant through its cashier with the knowledge of its officers and directors, covered a period of five and one-half years, the labor during the first part of the period being more burdensome and important than later, and were worth in the whole to defendant an average of $300 per year or $1,650 in all, on which the $125 paid should be credited and judgment rendered in plaintiff's favor for the balance.

On behalf of respondent various exceptions were filed to the referee's findings and a motion made for an order setting aside the report and directing judgment on the exceptions and evidence in its favor. The court disposed of the motion by an opinion of about eleven pages in the printed record, in which the following appears as the true state of the case:

There are only two disputed questions of fact. On neither does the referee make any findings. One is as to whether Hackett promised plaintiff pay for his services with the Brownell Company. As to that the evidence of the two is in direct conflict. The other is as to whether Rideout or Edwards, two other active officers of defendant, promised plaintiff pay for his services. On that he testified in the affirma-

tive and they contradicted him.    Therefore, as the burden of
proof was on the plaintiff, on the first controversy he failed to
present a preponderance of the evidence, and on the second
the preponderance was in favor of defendant.    Hence no ex-
press promise was established, and if there was any contract
"it must be one implied from undisputed evidence."

From the circumstances (a) that plaintiff's bank was
closely affiliated with defendant, each institution working, in
general, to promote the interests of the other; (b) that plaint-
iff was under strong personal obligations to Hackett and had
expectation of advancement as a reward for faithful service
for the general interests; (c) that the arrangement to look
after the Brownell & Co. business was made with Hackett
personally to conserve his interests, as the person to whom
the large indebtedness was, in fact, incurred, as well as to
conserve the interests of the Tigerton bank; (d) that he be-
came a stockholder with Brownell & Co. at the request of, and
by the personal assistance of Hackett and under a written
contract with him; (e) that when the services were performed
plaintiff was a stockholder of the company, one of its officers,
and was paid a salary by it; (f) that he made no claim against
defendant till the expiration of some five years and a half;
(g) that at no time was he expressly promised compensation
by any one on behalf of defendant; (h) that he never in fact
collected the indebtedness to defendant and his services were
valuable to his own bank, and specially valuable to Hackett;
and (i) that at times his conduct was adverse to defendant,—
the presumption must be that his services were, in general,
for the Brownell Company and, so far as defendant was con-
cerned, gratuitous.

The opinion, so called, closed with these words: "The find-
ings of the referee must, therefore, be set aside so far as they
conflict with this opinion; more specifically the fifth finding
of fact [as to whether the services were performed at the re-
quest of Hackett as cashier of defendant] and the conclusion

·of law; and such further findings may be drawn as are deemed proper in accordance herewith. Judgment is ordered for defendant dismissing the complaint on the merits with costs."

Agreeable to the suggestion as to other findings, counsel for defendant prepared for the court an instrument of nineteen pages in the printed record, denominated "order, findings ·of fact, and conclusions of law," under eighteen heads as to facts and four heads as to conclusions of law, covering, in a historical and argumentative way, the whole case, and, in the main, along lines suggested in the court's opinion, but empha-.sizing the court's opinion ideas and adding several material suggestions of fact, significant among them being, that plaintiff purchased the stock in the Brownell Company for speculative purposes and profited thereby.

The instrument so prepared was filed as the final determination of the court, and in accordance therewith judgment was rendered in defendant's favor.

For the appellant there was a brief by *Goodrick & Goodrick,* and oral argument by *E. J. Goodrick.*

For the respondent there was a brief by *Barbers & Beg-.linger,* and oral argument by *Charles Barber.*

MARSHALL, J. The record does not disclose the proof pro-·duced in favor of the reference. The order recites that it was satisfactory to the court. Counsel for appellant should have shown by the bill of exceptions precisely upon what the ·decision was made. They failed to do so. In face thereof it must be presumed a case was made on the motion warranting the conclusion reached. It cannot be assumed the order was made on the pleadings alone. The character of the cause, as shown by the complaint, does not indicate that the cause was ¬not referable under any circumstances. Error in regard to the reference not having been made to affirmatively appear by ¬bringing to our attention with certainty the exact nature of ¬the case as made to appear on the application to refer, the pre-

sumption must be in favor of respondent regardless of the case made on the trial.

A few observations respecting the practice followed subsequent to the filing of the referee's report will not be out of place. They will suggest, in a measure, why the decision of the trial court does not possess quite the force which it might have had.

Upon a referee's report being filed, and counsel thinking the findings of fact, or some of them, to be contrary to the evidence, exceptions may be filed and relief demanded by motion to correct. the findings and for judgment accordingly. Sec. 2865, Stats. (1898). That course was not strictly followed here, though in the opinion of the court it was substantially. Counsel for respondent moved on exceptions for vacation of the report and for judgment on the exceptions and the evidence. It is thought by the court that the trial judge regarded the motion as one to correct the findings of fact and conclusions of law and for judgment thereon as corrected. The motion was disposed of by a decision and opinion of considerable length covering all phases of the case, concluding, as indicated in the statement, by a determination that all findings conflicting therewith "must be set aside," etc., and the suggestion that "such findings may be drawn as are deemed proper in accordance herewith," followed by an order for judgment in favor of defendant dismissing the complaint on the merits with costs. The judge, in my personal view, but not that of the court, left it optional with counsel for respondent to enter judgment without any formal findings, or to have findings in their own language, consistent with the opinion, placed on file. The court, notwithstanding the closing language of the decision, is of the opinion that the judge expected such formal findings approved by him would be filed as a final basis for judgment; but, obviously, it was supposed such findings as might be filed would be in the language of counsel. That fact alone is not subject to criticism. That.

it is sanctioned by long settled practice all agree.   However, the course of events clearly explains why the findings signed were not a concise, logical statement of conclusions of the issues raised by the pleadings, but are somewhat of an argumentative review of the evidence in sections, having rather a partisan cast, extending to double the length of the very full statement and opinion filed by the court, and mentioning all details of the evidence favorable to respondent in very favorable light with all the minor conclusions mentioned by the trial judge and some significant ones besides.   There is no intention in this to reflect upon the able counsel or circuit judge.   The cause from the standpoint of the advocate was well presented in the findings and they covered every point in the case.   But that the cause came to be pictured in a somewhat one-sided way is most natural.   Such cast is indicated by the finding that plaintiff became a stockholder in the Brownell Company with the expectation of making a profit on his stock and succeeded in doing so.   We are unable to find anything in the court's decision and opinion decidedly to that effect.   The evidence, as it seems, is the other way, as will be demonstrated later on.

Looking at the record in the whole, it seems the real judicial thought embodied in the judgment is found most certainly in the decision and opinion.   Therefore, in treating the case, it will be done largely from that viewpoint, paying careful attention to the findings as well.

Taking up the merits of the case we will observe, at the start, that a report of a referee appointed to hear, try, and determine a case is of no little dignity.   It does not fall much, if any, short of findings of a trial court.   In review by the latter court no greater liberty can well be taken with such a report, than this court according to the settled practice, can take with conclusions on matters of fact made by a circuit court.   The trial court, in terms, recognized that general rule. It is one thing to recognize the mere language of a rule and

quite another to appreciate the force of it according to settled practice.   In this respect it seems the trial court's determination bears some evidence of infirmity.

When it is said that the findings of a referee should be affirmed by the circuit court unless they are against the clear preponderance of the evidence, as in *Leasia v. Penokee L. Co.* 103 Wis. 304, 79 N. W. 224, and many similar cases, the same degree of certainty respecting the rightfulness of the referee's decision is intended as in case of findings made by a court when the same language is used in respect thereto.   *Ott v. Boring,* 139 Wis. 403, 121 N. W. 126.   The rule contemplates a strong presumption in favor of the findings; one that cannot be displaced unless the evidence against them is so clearly that way that failure to decide according to the preponderance appearing from the printed or written record, cannot reasonably be accounted for by the helps which the trial officer may have had that could not be made a matter of record for the benefit of a reviewing court, particularly the appearance of witnesses and their manner while giving their evidence.   These unrecordable helps in discovering the truth, may, reasonably, be so significant that, when findings rest upon conflicting evidence from the mouths of witnesses, they cannot be much more easily disturbed by a reviewing court than the verdict of a jury.   In any event, reasonable doubts, under all the circumstances, as to whether the evidence preponderates against the findings, are to be resolved in favor of the negative.   The statute says that the report of a referee shall have the effect of a special verdict.   Sec. 2865, Stats. (1898).   It is not improbable that the Code makers intended that they should stand upon the same plane, as doubtless it was that they should, in substance and conciseness, be substantially the same, as such special verdict.   In the beginning it was said that such finding could only be disturbed in such circumstances as would warrant setting aside the verdict of a jury.   Later the rule we now have was adopted, largely, as a

history thereof shows, with reference to decisions in other jurisdictions having no Code provision like our sec. 2865.

The real significance of the term "clear preponderance of the evidence," unless from time to time specially recurred to in opinions of this court, it seems is liable to be lost sight of, as there are quite persuasive indications that it was here.

In *Ott v. Boring, supra,* the matter was considered at considerable length. There the trial court, as here, radically changed the findings of the referee. That was unexplainable from the record, except upon the theory that the true meaning of "clear preponderance of the evidence" was not appreciated. After a full review this court felt bound to reinstate the findings and order judgment accordingly. It was there said that all reasonable doubts are to be resolved in favor of such findings; that

"there are many things which cannot be spread upon the printed record, but may properly be considered by a trial court and are of great, and often controlling, significance in determining the truth as between conflicts from the mouths of witnesses. As experience shows, and from the nature of things, justice is much more likely to be done by leaning pretty strongly upon the initial determination than by endeavoring to treat a disputed matter from an original standpoint."

·The rule as to clear preponderance of the evidence, requires the overbalancing weight to be "so apparent as to manifestly outweigh any probable legitimate influence upon the triers of those advantages for discovering the truth which the reviewing tribunal cannot have." It was suggested in *Menasha W. W. Co. v. Michelstetter,* 126 Wis. 427, 105 N. W. 927, that it must appear, looking at the printed record alone, that the evidence in support of the findings is overwhelmingly overcome to warrant disturbing them. That was emphasized and enlarged upon in *Rankl v. Schmidt,* 133 Wis. 103, 106, 113 N. W. 423. In *Endress v. Shove,* 110 Wis. 141, 85 N. W. 651, it was said that such rule is unbending and admits of no exception.

Thus it will be seen firmly entrenched in our jurisprudence, that there is little room for disturbing the report of a referee or the finding of a trial court unless the same are manifestly so contrary to the evidence as to be really unexplainable except upon the theory of wrong rules of law having been applied, or material evidence having been wholly overlooked, or a perverted view having been taken of the case. So a situation, as experience shows, seldom is presented where either the conclusions of a referee or trial court, on mere matters of fact, are disturbable. Further, that the most common mistake in changing reports of referees comes from either not appreciating the significance of the term "clear preponderance of evidence" or that it applies to a referee's report when under consideration by a trial court the same as the findings of the latter when under review by this court.

Here there are quite plain indications that the trial court while starting out by recognizing the language of the rule we have discussed straightway entered upon doing what was done and condemned in *Ott v. Boring, supra,* viz.: treating the "disputed matter from an original standpoint," as we shall now see.

The court opened the review of the case, as indicated in the statement, by observing that "there are only two disputed questions of fact on neither of which does the referee make findings." Then reference was made to the conflict between Hackett and plaintiff as to whether the former expressly promised the latter compensation for his services and the conflict between Rideout and plaintiff as to whether the former as an official of respondent, on one occasion promised the latter compensation, and Edwards, also one of such officers, at one time made a like promise,—as the two disputed questions, and then it was observed that, since in the first instance Hackett and plaintiff were in direct conflict, there was, obviously, no preponderance of evidence in favor of the latter, and that in the other instances there was the same situation as to Edwards, creating a preponderance of evidence against plaintiff.

Keeping in mind that the recovery was not sought on express contract, and that nothing appears in the complaint suggesting any such contract, it will be seen that the court misconceived the situation in referring to the mere evidentiary conflicts outside the cause of action disclosed in the pleading as involving facts in issue which the referee neglected to pass upon, and furthermore, by speaking of all other facts as not in dispute.    There was no necessity of passing upon the two particular matters in the findings; none whatever.    The trial court not only mistakenly dignified the mere conflicts as·if they were vital facts in issue, but misapplied the law thereto. Certainly the learned trial judge, by mere oversight rather than want of knowledge on the subject, held that, necessarily, there was no preponderance of evidence in appellant's favor in the one case because he was contradicted by one witness, and that there was a preponderance of evidence against him because as to one occasion he was contradicted by Rideout and another by Edwards.    It is a common thing for a finding of a court or jury to be made in favor of the party on whom the burden of proof rests on his uncorroborated evidence alone, clearly contradicted by the adverse party.    A matter in issue on conflicting evidence is not to be settled by merely taking account of the number of persons testifying adversely.    One may testify as positively as the other, yet the evidence of one reasonably appear clearly true and the evidence of the other even wilfully false.    We shall not take time to discuss the credibility of the evidence referred ·to, but will remark that while there are circumstances that might be so viewed as to fatally discredit the evidence of appellant there are many others which tend to corroborate him and discredit the evidence of Hackett, Rideout, and Edwards, so that had the cause of action been on express contract and a finding been made in appellant's favor as to the conflicts referred to, it is difficult to see how the result could be disturbed as against the clear preponderance of the evidence.

The suggestion of the trial court as to the findings of the

referee not covering the case, does not seem to be warranted. The findings might well have been somewhat more in detail, but they have the merit of conciseness, also of brevity, also of being pretty free from mere evidentiary matter and wholly free from mere argumentation. They are, in the main, framed in the language of decision as such findings should be. In language making about three pages of the printed record, they state, in a fair way, the ultimate facts upon which the legal conclusion reached by the referee was based.

The theory of the complaint is that appellant, at the request of Hackett, respondent's cashier, who was competent to bind it by contract, performed for it services in protecting it from loss by reason of having become a creditor of the Brownell Company to an excessive amount; that he complied with such request, rendering valuable services covering a period of over five and one-half years, and that, thereby, respondent became liable to pay him the reasonable value thereof as upon implied contract.

There can be no fair question but what all the facts necessary to such an implied contract were covered by the referee's finding with some particularity regarding the nature of the services and the circumstances of their rendition. It was wholly unnecessary to find, in words, that the parties made a contract by implication. The finding of all the minor facts necessary to the major one as a legal inference, the nature and amount of the services rendered, the reasonable value thereof, and the amount received thereon, was all-sufficient. To have added, as a conclusion of fact, that the parties made an implied contract that the services of appellant should be for hire was entirely unnecessary, though it would not have been an impropriety. There was a necessary implication of fact, as matter of law, from the minor facts found, so fully covered in the general conclusion that appellant was entitled to judgment for the amount found to be the reasonable value of the services less the amount found to have been paid thereon.

So it will be seen, up to this point, that as matter of law and fact as well, the trial court took a wrong view of the case. Mere conflicts in evidence outside the issues were referred to as facts in issue. The status of appellant's evidence in face of a conflict therewith, an even balance as to mere numbers, was misapprehended. The findings were treated as not covering the case, which from the standpoint of the pleader they did fully.

From the point to which we have arrived the court proceeded very much, if not wholly, as upon an original decision of the case. At the outset, and as a preface to the consideration to follow, it was stated, as matter of law, that there being no express contract established there could be no recovery except upon "a contract which the law implies from the undisputed evidence."

We confess that for some time we were not clear as to what the learned circuit judge intended by the quoted language. Counsel for respondent seemed, on the oral argument, to share with us that difficulty and endeavored to clear up the ambiguity. They did not do so satisfactorily. They confessed, as we understood that, taking the learned judge's language literally, it shows a misconception of the law. At the best we can look at the matter, the quoted language, by itself, creates doubt as to whether there was such clear view of the law and evidence as warranted overturning *in toto* the findings of the referee.

Obviously whether there was an implied contract entitling appellant to recover or not, did not, necessarily, depend on "the undisputed evidence." That the court could not well have used that term as a characterization of the true state of the evidence, as counsel for respondent suggest, is plain, as there were several conflicts from the mouths of witnesses and very material conflicting evidentiary inferences, as the discussion by the court in the decision and opinion and the much more extended discussion in the findings, so called, which counsel

prepared, shows. Some important evidentiary matters were worked out, largely from conflicting inferences. The question of whether there was an implied contract, was not, necessarily, solvable from the undisputed evidence but from the preponderating evidentiary inferences from facts established directly and circumstantially, there being conflicting inferences even as to many of the minor facts.

Did the respondent, through its cashier, request appellant to perform the service for which compensation was claimed? That was found, as before stated, in his favor by the referee. He testified that such request was made by Hackett in his capacity as cashier. Hackett so testified, very clearly, as we understand his evidence. He carried the idea, it is true, that he did not promise appellant compensation and did not think of his getting any from the bank, but the whole trend of his evidence, from first to last, is that his dealings in respect to the matter with appellant were in his official capacity and to save respondent from danger of serious loss which, at one time, he thought might run up to many thousands of dollars in case of the Brownell Company not being so supervised and advised respecting its affairs as to save it from apparently impending bankruptcy. Moreover, Hackett's evidence tends to prove there was talk between himself and appellant with respect to compensation. He said he told plaintiff he had no authority to promise compensation. But that was a confession that compensation was talked about. The subject was so far in the minds of both that the very suggestion that he had no authority to expressly promise remuneration was rather pregnant with the idea that appellant would have to rely upon the implication which would arise from the circumstance than the idea that whatever he did would have to be regarded as done gratuitously.

True, the notes held by respondent were taken in the name of Hackett and the securities ran to him, circumstances to which the court seems to have given controlling effect in com-

ing to the conclusion that the whole affair was a personal one of Hackett's. But, as we read the evidence, it is undisputed that the two loans, the first of $15,000 and the second of $10,000, were made by the bank, Hackett using his name as a mere convenience. The bank advanced all the money. All the notes passed through it. All seem to have been kept by it, except a part to prevent an appearance of excessive loans having been made. One familiar with the way such business is done can easily see that Hackett had no mere personal connection with the matter. The evidence indicates he made the loans as a bank matter, and all the operations so far as the loans were concerned, in which he used appellant very efficiently, were to save the bank from any loss, direct or indirect. Not only is the finding of the referee that the loans were bank loans and appellant assisted in making them good at Hackett's request, acting officially, not against the clear preponderance of the evidence, but are very strongly supported thereby. There are very many circumstances on this corroborating the direct evidence of Hackett and appellant, but we shall forego referring thereto in detail. Taking the case as a whole, there was no warrant which we can see, in disturbing the finding of the referee as to substantially all appellant's services as regards the two loans aggregating $25,000 having been for respondent rather than for Hackett personally.

That the services rendered by appellant, extending as the referee found and upon evidence well supporting it, over some five years and a half, were very valuable to respondent, seems to be supported by substantially all the evidence. The evidence belittling the service, given by some witnesses on the part of respondent, though very persuasive, apparently, with the trial court, seems to have, as in our judgment it well might, almost fatally discredited their testimony with the referee. Hackett, who was evidently the master spirit in respondent's behalf for some three years after the service com-

menced, during which the most burdensome part was performed, and the only one who really knew enough about the situation during that period, to be able to appreciate the nature, extent, and value of the service, had no hesitancy in agreeing, substantially, with appellant, except as to his having made an express promise on behalf of the bank, or had in mind the idea that appellant would be entitled to pay. He put the value of the services of appellant in managing the Brownell business at some $40 per month in excess of the amount paid at any time by the company, and it must be remembered that for a large part of the time there was no compensation from that source. He placed the value as to respondent quite as high, if not higher than the referee. His evidence shows that respondent's officers, other than himself, did not know, except in a general way, about the services, and the evidence of such officers corroborates that. So to the extent that the referee found appellant's services were quite valuable to respondent, especially from some time in 1902 to about the close of 1905, there is no clear preponderance of evidence against it, or really any very credible evidence.

From the foregoing we have these verities: (a) Appellant was requested on behalf of respondent to perform for it services; (b) he complied with such request continuing his labor till the task assigned to him was ended; (c) his services were very valuable to the respondent. From such circumstances there arises, as matter of law, a presumption of fact that the services were performed under contractual relations. It is a mistake, in the technical sense, to speak of the contract as one implied by law. There are such contracts. They arise where there is a legal duty to respond in money which by a legal fiction may be enforced as upon an implied promise. In such case there is no element of contract strictly so called. There is only the duty to which the law fixes a legal obligation of performance as in case of a promise *inter partes*. So it is called in the books a *quasi*-contract. There are implied con-

tracts in the strict sense of the term. In this case we are dealing with the subject of implied contracts in such sense. Such a contract requires, the same as an express contract, the element of mutual meeting of minds and of intention to contract. The two species differ only in methods of proof. One is established by proof of expression of intention, the other by proof of circumstances from which the intention is implied as matter of fact. The implication arises upon legal principles and is conclusive in the absence of something efficiently displacing it, as a presumption of law. Unlike the latter, it being an implication of fact though springing into existence as matter of law, it is rebuttable. 15 Am. & Eng. Ency. of Law (2d ed.) 1078.

The general rule is that if a person performs valuable services for another at that other's request, the law implies, as matter of fact, the making of a promise by the latter and acceptance thereof by the former to pay the one performing the service the reasonable value thereof. *Wheeler v. Hall,* 41 Wis. 447; *Kelly v. Houghton,* 59 Wis. 400, 18 N. W. 326; *Link v. C. & N. W. R. Co.* 80 Wis. 304, 50 N. W. 335. If one merely accepts services from another which are valuable to him, in general, the presumption of fact arises that a compensation equivalent is to pass between the parties, and the burden of proof is upon the recipient of the service to rebut such presumption if he would escape from rendering such equivalent. The burden may be much more easily lifted in such a case than in the case of there being a request for the performance as in this case. That is well indicated by the logic of *Link v. C. & N. W. R. Co., supra.*

Thus here we have a situation, so far, of there being a presumption of fact, and a pretty strong one, of a mutual intention that there should be an exchange of contractual equivalents between the parties. The referee found such fact and, in effect, that the presumption was not successfully rebutted by respondent.

At this point we have a significant infirmity in the court's logic. The case in hand was likened to one where there has been no request for the performance of the service; only an acceptance, complicated with such circumstances as to prevent the inference of fact in favor of compensation arising. *Ames v. Lamont,* 107 Wis. 531, 534, 83 N. W. 780.

Having, without warrant it seems, overturned the finding of the referee as to the services having been performed upon request, the court failed to reach a point where the burden was cast on respondent to rebut the strong *prima facie* case. With that error to start with, the road to the result reached was not so difficult to logically travel as it otherwise might have been.

Did the referee decide against the clear preponderance of the evidence in holding that the respondent failed to efficiently rebut the presumption of fact in appellant's favor arising from the verities heretofore mentioned, which were, as we have seen, too strongly entrenched in the evidence to admit of their being properly disturbed on the review?

In view of what has been said it would seem that the question last suggested might well be answered without any discussion. If the errors already referred to had not been committed, doubtless such question would have been answered by the trial judge in favor of appellant. We will refer to the more significant circumstances upon which the conclusion was reached.

As we have seen, the findings by the referee efficiently condemn many of the conclusions as to the existence of circumstances indicating that it was supposed by the parties, the services were gratuitously performed. Two were of much significance, viz.: (a) the services were performed by request of defendant, through its managing officers, and not for Hackett personally; (b) such services were very valuable to respondent.

One other matter referred to by the court is that the services were substantially as valuable to appellant's bank as to

respondent. If that were so the fact would still remain that appellant was not under obligation to serve respondent, while he was his own bank, but the fact is that his work was of vastly more importance to respondent than to any other party,—even for the Brownell Company. We shall not go into detail on this. Suffice it to say, the interest of respondent in having the work performed, which appellant did, appears so much greater than that of the Tigerton bank as to make the latter appear quite insignificant.

Again the suggestion was in effect made that appellant received full pay from the Brownell Company. But the fact seems to be that he received no pay whatever for the first six months or so and none commensurate with the value of his services for the next two years or thereabouts, and none for some two years and a half thereafter; while, according to the testimony of the witness who seemingly was the best judge from every point of view, his services in the outside work were worth, during the last two years, $50 per month.

Another circumstance referred to is that for most of the time appellant was a stockholder and, as said in the findings but not in the decision and opinion, he bought the stock for and made a profit. If that had any sound basis in the evidence it would be very persuasive though far from conclusive. We are unable to find such basis. As we read the evidence the stock was purchased solely to enable appellant to make his work of supervision in the interest of respondent, successful. It seems that is the effect of appellant's and Hackett's evidence. The former did not put but twenty per cent. of the par value of the stock into the venture. He did not, in reality, furnish any of the money. It was done by the bank through Hackett. He took appellant's note with the stock as collateral, then turned the matter over to the bank where it remained for some two years and a half, appellant paying interest to the amount of $187, when the stock was sold, netting the face of the note, and the money was turned in to take it

up. Thus he was out the $187 and interest thereon, amounting in all by the time the second turn was made to about $210. Again he took the stock and in a few months sold it, the carrying charge being about $35 as near as we can figure from the evidence. The second sale was at an advance over the purchase of $200, thus leaving him a loser to the amount of some $40. He summed up the matter by saying, "I was a little out on the stock," which seems strictly true. When he first took the stock he requested Hackett, evidently as representing the bank, to bind himself to share half the loss, if any occurred, showing that loss rather than profit was thought to be within reasonable probabilities. The amount paid by the Brownell Company could not have much, if any, more than offset his expenses during the five and one-half years. He testified that Hackett created the salary really to take care of the expense incident to the situation filled by him and we do not find that denied, effectively, anywhere.

The further fact is referred to that respondent paid appellant $125 in 1905 as a gratuity, he making no claim for services, and that it was ample to compensate him for all he did specially for respondent. The finding of the referee was that such payment was made to apply on services, or expenses, or both. We are unable to find any warrant for disturbing that finding. The idea that it was a fair equivalent for appellant's services seems to be contrary to the evidence of Hackett and to all the credible evidence. It is based on that of Rideout and Edwards, particularly the latter. The fact that they gave evidence of that character, as heretofore suggested, greatly impaired their credibility. The only excuse we can discover for their giving such testimony is that they knew very little about the real nature of appellant's services, which, as before said, pretty clearly appears to be the fact. We will assume that they testified honestly with the light they had. That is as far as we can go in face of the fact, quite apparent from the record, that appellant's expense up to the time the

$125 was paid must have been quite as much, if not more than
that sum.

Again the fact is given much significance that there was
such a community of interest between respondent and appel-
lant's bank that it was appellant's moral, if not his legal duty,
to serve respondent, as he did, and without pay.   The idea that
a man of appellant's conceded ability working under a very
small salary for a bank, which was, in a legal sense, wholly
separate from respondent, and having, to a considerable extent,
different stockholders, had any moral or legal duty to work
over hours performing services of a reasonable value of more
than two thirds all paid him for full time at his bank, es-
pecially to do such work for the wealthy aggregation consti-
tuting the respondent, seems to be far-fetched.   In our judg-
ment the reasonable inference is rather that appellant ex-
pected that an institution of the dignity of respondent and a
body of men of the evident financial standing of its stock-
holders would not only be willing to but would insist upon
paying him fairly for his services; that he expected pay, and
that respondent by its responsible officers, especially the man-
ager, Hackett, expected to render pay, if they thought about
the matter at all.   Perhaps they did not think about it, but
that does not relieve respondent from responsibility.

True, Hackett, who really did all the business with appellant
on behalf of respondent for the first two or three years, testi-
fied, in effect, that he did not have it specially in mind during
the time the services in question were being performed that
there would be any expense on account thereof against the
bank.   However the legal presumption of fact, arising from
the request for and performance and value of the services to
respondent, is not rebuttable by mere evidence that Hackett
or any one else connected with the bank did not think of the
subject of compensation.   Neither party may have specially
thought about the matter and yet the presumption in favor of
appellant would stand if the situation was such that, had the

parties turned their attention thereto in view of the law, there would or ought to have been mutuality of thought in respect to the matter.

It is further suggested that appellant made no definite claim for compensation till some five years after his service commenced. That was given great weight in favor of respondent. It might have been given such weight by the referee and may have been. However, it is short of being of sufficient weight to warrant setting aside his finding in view of the fact that the claim for compensation was made quite promptly after the indebtedness of the Brownell Company was paid off. Till that time appellant may have thought he was not in a very good position to determine, himself, how much his services were reasonably worth. The fact that he finally aided in closing the matter up by inducing parties to put a large amount of new capital into the company and, by his personal responsibility, assisting in obtaining money to make the final payment, and that too after he ceased to expect any profit on his stock, if he ever did, which does not seem to be the case, thus putting himself in the breach, finally, to end his task, is hardly explainable upon any other reasonable theory than that he expected in the end, and had reasonable ground to expect, pay for his work by respondent.

The only other suggestion we will mention, given significance by the trial court, as indicating that appellant's services were intended to be gratuitous, or at least that he was in no position to claim compensation therefor, is that on one or two occasions he acted adversely to respondent in reference to its relations with the Brownell Company. To our minds the court drew that conclusion from the evidence without discovering the real ground of respondent's conduct as the referee might well reasonably have viewed it. It appears that for some two or three years prior to the time the court referred to, appellant had been pursuing a policy, determined upon by him and respondent's cashier, which they jointly supposed

would, in due time, rescue it from all danger of loss and at the same time save the Brownell Company from bankruptcy, which was a matter of some interest to the bank. Pursuant to that policy he had worked to induce the putting of new capital into the company, had carefully conserved all its assets, and had aided materially by the operations of the Tigerton bank and to the profit of the proprietors of respondent as stockholders thereof. After the lapse of such time Hackett's connection with respondent and the Tigerton bank was severed. The relations of respondent's officers with him became, evidently, somewhat strained, especially on account of the extension of credit to the Brownell Company. There was dissatisfaction as regards the status of that indebtedness and the slowness with which the prospects of final liquidation had brightened. In that situation such officers thought to change the policy to one of coercion. To that appellant objected, seemingly, because he, under the direction of Hackett, had, as he supposed, committed himself and respondent to a friendly course, thinking that would, in the end, be the best way to bring about the result desired. So he objected, rather strenuously, to the attempted change, but in no spirit of hostility as it seems. Certainly, as appears, he was finally not only permitted, but rather encouraged, probably urged to keep on with the plans theretofore pursued, which he did, resulting in respondent being paid the balance due it June 29, 1908, some $14,000, out of a loan obtained for the company by his efforts, and partly, as before said, upon his responsibility, and thus the long campaign, commenced over five years before, was brought to a successful termination. In that light, which is at least a reasonable view, and so should be taken in support of the referee's finding, the incidents given so much dignity below against appellant do not appear important.

It seems needless to add that though the inferences which the court drew from the evidence were not so wholly without warrant, that had the findings of fact been those complained

of now perhaps they could not have been set aside as against the clear preponderance of the evidence, it is quite clear that had the trial court made, as an original matter, the findings which the referee made, they would easily have stood the judicial test on appeal. It is from that standpoint the case must be viewed.

The question as to whether the reasonable value of the services is against the clear preponderance of the evidence needs no extended treatment in addition to the foregoing. There seems to be no question but what the time, five years and a half, as fixed by the referee, is right; none but what the value of the services in the whole, as fixed by Hackett who evidently knew most about the matter, is moderate. The difficult question for the referee was to determine how much was the reasonable value of the services chargeable to respondent under all the circumstances. He considered that the chief purpose of appellant's efforts was to save respondent from loss and that the purpose was fully accomplished. There is no room in the evidence to reverse that, as we have seen. The record shows that in the early part of the period of service the active agent in managing respondent, regarded the bank to be menaced by danger of losing some $10,000 or more, unless some such policy was adopted as the one resorted to. The testimony of other officers who did not know much about the difficulties, and perhaps were designedly kept in ignorance thereof by the cashier, that they regarded the bank secure, and on that account placed little value on appellant's services, cannot clearly outweigh the evidence supporting the findings. On the whole, the conclusion of the referee that about half the total value of the services, as sworn to by Hackett, or $25 per month, without expenses, which must have been considerable, should be charged to respondent, seems to have at least such fair support in the evidence as to leave no reasonable ground for holding such conclusion to be against the clear preponderance thereof.

*By the Court.*—The judgment and order on which it is based are reversed, and the cause remanded with directions to confirm the referee's report and render judgment accordingly.

KERWIN and TIMLIN, JJ., dissent.