CITIZENS STATE BANK, APPELLEE, v. STATE BANK OF OELRICHS, APPELLANT.

FILED FEBRUARY 13, 1924.  No. 22664.

1.   Appeal:   ADMISSION OF EVIDENCE.   Under the facts in this case,

it was not prejudicial error to admit in evidence as corroborating testimony an unsigned written memorandum made in pursuance of a conversation between the parties, more especially since the court instructed the jury, "that, if the understanding was that no agreement was to be binding until a contract in writing had been made out and signed, then the contract not having been signed, there would be no contract."

2. Contracts: PROOF. A promise may be proved either by express words, or by evidence of such facts and circumstances, together with the words used by the parties at the time, from which reasonable persons in conducting the ordinary affairs of business, but with special reference to the particular matter in hand, would be justified in inferring such a promise.

3. Evidence examined, and *held* to support the verdict.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. *Affirmed.*

*E. F. Dougherty* and *Corey & Sunderlin,* for appellant.

*Crossman, Munger & Barton, contra.*

Heard before MORRISSEY, C. J., LETTON and GOOD, JJ., ELDRED, District Judge.

LETTON, J.

The Citizens State Bank of Chadron brought this action against the State Bank of Oelrichs, a South Dakota bank, to recover for the expense of feeding and caring for certain cattle belonging to August T. Englebert, upon which the Oelrichs bank held a chattel mortgage. Three causes of action were set forth in the petition, but only one was submitted to the jury, which was, whether the feed and services were furnished under an express contract. Plaintiff recovered a judgment, and defendants appeal.

There is no dispute that the feed was furnished and that the reasonable value of the same was $2,570.30. A promise by the defendant to pay for it is denied.

The facts are that a partnership, Bailey Brothers & Englebert, and certain of the partners as individuals, owned several hundred head of cattle in a herd which were cared

for by the owners, near Oelrichs, South Dakota. Plaintiff had a mortgage for about $18,000 upon 496 head of these cattle, and also owned a number of them. August T. Englebert, one of the partners, owned individually 107 head. He was indebted to the Oelrichs bank, defendant, in a balance of over $5,000, upon a promissory note secured by a chattel mortgage on these 107 head. There being a scarcity of feed in the locality of Oelrichs, an arrangement was made between the Citizens State Bank and the owners of the cattle upon which this bank had a mortgage, whereby the cattle described in its mortgage, or what were left of them, were to be shipped from Smithwick, South Dakota, to Merriman, Nebraska, and the Citizens bank was to finance the feeding of the cattle until shipped and sold. The cattle were shipped to Merriman under this agreement. But when A. L. Johnson, president of the Citizens bank, went to Merriman to see the cattle, he found 81 head belonging to Englebert, on which plaintiff bank had no lien, and on which there was a mortgage to the defendant State Bank of Oelrichs. Plaintiff had no knowledge that these 81 head of cattle had been shipped to Merriman until about two weeks after they had arrived there. When this was ascertained, Johnson, for the plaintiff, telephoned to Mr. Bennett, the cashier of the Oelrichs bank, informing him of the fact, and asked him if the Oelrichs bank would pay its *pro rata* share of the feed bill. He said he would consult the president of the bank and advise him later. They arranged at that time that Bennett and he should go to Merriman to look over the cattle. The parties met at Merriman and talked to Englebert who was in charge of all the cattle. Bennett knew that 81 head of the cattle mortgaged to the Oelrichs bank were being fed and cared for at the expense of the plaintiff bank. There is a sharp conflict in the evidence as to what conversation occurred between the representatives of the two banks at that time and place, Johnson testifying that he told Bennett he would make out an agreement that the Oelrichs bank would pay its *pro rata* share of the feed, and send it to him for signature; that

Bennett said, "All right, send it along and he would look it over." Bennett testifies that he said he had no authority to agree to this without consulting Mr. DuMoulin, the president of the Oelrichs bank. Upon Johnson's return to Chadron, a written agreement was drawn up, providing in substance that the plaintiff should furnish the money for the feeding of the cattle, and that each of the respective owners of the cattle who were named in the agreement, and the Oelrichs bank, should pay his or its *pro. rata* share of the expenses. This writing was sent to the Oelrichs bank, but was not signed nor returned. Mr. Johnson severed his connection with the plaintiff bank on January 1, 1920, Mr. Schwieger then becoming president. Schwieger testified that Mr. Bennett was in the Chadron bank some time after this, while the cattle were still at Merriman, and that he there unequivocally promised that the Oelrichs bank would pay its share of the feed bill. Bennett testified that in this conversation he said they would pay the feed bill if they could get a note from Englebert, and if the plaintiff bank would reconvey to Englebert a 160-acre tract of land in South Dakota upon which there was a mortgage of $28,000. As to this deed, Englebert testified that he had agreed with the plaintiff bank that it should pay the Oelrichs bank debt secured by mortgage on the 81 head, and that he should make a new note and mortgage to the Citizens' bank, and also convey his interest in this land to it as additional security. This is denied by Johnson, who says that the deed was given as additional security on the debt to the plaintiff bank since a large number of cattle included in the mortgage which that bank held against the partnership had died or had disappeared. The 81 head were shipped back to South Dakota. After this there was a conference in the bank at Oelrichs between the respective owners of all the cattle that had been fed at Merriman, and the mortgagees (plaintiff bank and the Oelrichs bank), and the *pro rata* share of the expenses per head was ascertained. Mr. Schwieger and Mr. Birdsall, representing the plaintiff bank, both testified that Bennett again agreed specifically that

the Oelrichs bank should pay its *pro rata* share of the feed. This is again denied by Bennett. There is some corroboration of the testimony of Schwieger and Birdsall. The whole matter was submitted to a jury under an instruction which fairly states the issue as to whether there was an express promise to pay the *pro rata* share of the feed consumed by the 81 head upon which the Oelrichs bank had a mortgage. The jury found for the plaintiff.

Defendant insists that the verdict is not sustained by the evidence; but, although in sharp conflict in some respects, it is sufficient to support a verdict.

It is also assigned that the court erred in overruling a motion of defendant at the conclusion of plaintiff's testimony to dismiss the action and direct a verdict against the plaintiff. Defendant did not stand upon this motion, but elected, upon its being overruled, to introduce its evidence and submit the matter to the jury. This constituted a waiver of the right to complain of this ruling of the court. *Baker v. Racine-Sattley Co.*, 86 Neb. 227.

The court permitted the written memorandum which had been submitted to but not signed by the defendant to be admitted in evidence, and this is assigned as error. In this connection the court instructed the jury:

"You are instructed that, if the understanding was that no agreement was to be binding until a contract in writing had been made out and signed, then the contract not having been signed, there would be no contract. But if the terms of the contract were all agreed upon at Merriman, and a binding promise made by defendant bank to pay its *pro rata* of the expense and feed, then the fact, if shown, that it was intended that such contract should be expressed in writing and signed, and which was not done, would not prevent the oral contract from taking effect."

This memorandum corroborated in some respects the testimony with respect to the nature and character of the transaction between the parties and tended to show the nature of the parol contract. We cannot see how its admis-

sion was prejudicial. *Carstens v. McDonald,* 38 Neb. 858; 22 C. J. 896, sec. 1093; *Hazer v. Streich,* 92 Wis. 505.

Complaint is made of a number of the instructions as being confusing and inconsistent. Separated from the context, perhaps one or two of the instructions are subject to this criticism, but instructions are not to be considered in this manner. When the charge is taken as a whole it fairly and clearly submitted the issues in the case to the jury.

Complaint is made that instruction No. 6 tells the jury that a promise may be proved either "by evidence of an express promise made by the defendant to make such payment, or by evidence of such facts and circumstances, together with the words used by the parties at the time, from which reasonable persons in conducting the ordinary affairs of business, but with special reference to the particular matter in hand, would be justified in inferring such a promise." And it is said that this was decidedly improper. Mr. Williston says:

"Though assent must be expressed in order to be legally effective, it need not be expressed in words. In the early law of assumpsit stress was laid on the necessity of a promise in terms, but the modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surrounding circumstances. Even where words are used 'a contract includes not only what the parties said, but also what is necessarily to be implied from what they'said.' And it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such." 1 Williston, Contracts, sec. 22a.

Many cases may be found to support this proposition in addition to the cases cited in the text.

The supreme court of Wisconsin has said: "The question of whether there was an implied contract was not, necessarily, solvable from the undisputed evidence, but from the preponderating evidentiary inferences from facts established directly and circumstantially, there being conflict-

ing inferences even as to many of the minor facts." *Wojahn v. National Union Bank,* 144 Wis. 646, 664.

Complaint is made that the court refused to give instruction No. 3, that there could be no recovery unless there was an express contract upon the part of the Oelrichs bank to pay a share of the feed and expense bills, and that, as it was not the owner of the cattle, the fact that it knew the Citizens State Bank of Chadron was spending money upon the cattle and permitted it to expend money for the care of the cattle does not make it liable for any part of such expense. By instruction No. 7 the jury were told that the mere fact that the Oelrichs bank had a mortgage upon a portion of the cattle and knew that they were being fed at the expense of the plaintiff would not raise any implied promise to pay the plaintiff. And the necessity of proof by a fair preponderance of the evidence that a contract had been made by it to pay for the feed before defendant bank would be liable was embodied elsewhere in the charge. The real question in the case is one of fact and the jury determined it upon conflicting evidence. We see no reason to interfere with the verdict.

AFFIRMED.