Roy W. THEUERKAUF, Plaintiff-Appellant,

v.

Robert E. SUTTON, Defendant-Respondent-Petitioner.

Supreme Court

*No. 79–1716. Argued April 27, 1981.——Decided June 2, 1981.*

(Also reported in 306 N.W.2d 651.)

For the respondent-petitioner there was a brief and oral argument by *Walter F. Kelly* of Milwaukee.

For the appellant there was a brief and oral argument by *Harry W. Theuerkauf* of Milwaukee.

COFFEY, J.   This is a review of a decision of the court of appeals reversing a judgment of the circuit court for Milwaukee county, the Hon. PATRICK J. MADDEN, presiding.

This case involves the question of an attorney's personal contractual liability for the cost of professional accounting services requested by the attorney in the preparation of his clients' (attorney's) cases.  The attorney neither expressly promised to pay for such services, nor expressly disclaimed responsibility for payment and the record establishes that at the time the services were requested, neither party said anything as to whom the accountant was to look for payment.

The plaintiff in this case, Roy W. Theuerkauf, a certified public accountant, filed a small claims action on June 14, 1979, pursuant to ch. 799, Stats., against the defendant-attorney, Robert E. Sutton, for fees totaling $800 for accounting services he rendered in three divorce cases for Sutton.  The complaint alleged that such services were performed "at the special instance and request of the defendant, . . . [and] at agreed upon prices, which defendant agreed to pay."  Sutton filed a written answer denying the allegations in the complaint and the case was tried to the court.

At trial, Theuerkauf testified that his first business contacts with Sutton involved preparing Sutton's personal income tax returns and "law practice payroll tax returns."  He stated that from 1974 through 1978, Sutton personally asked him to review the value of the marital estates of at least eight of Sutton's divorce clients.  In each case, Theuerkauf was always personally contacted by Sutton and requested to "prepare a property division which would produce the least amount of tax to both parties involved."[1]  Theuerkauf performed the

---

[1] Theuerkauf testified as to the usual mode of the request for his services as follows:

requested work and, in each case, sent his bills directly to Attorney Sutton. All of Theuerkauf's services were billed to Sutton and paid in full, except the three cases in issue.

The three bills not paid in full form the basis for this suit and involve the services performed in the Sims, Klatt and Erdell divorces. The billings in these cases, as in all the previous cases, were sent directly to Sutton and captioned as follows:

> "IN ACCOUNT WITH:  Mr. Robert E. Sutton
> Attorney at Law
> 1409 E. Capitol Drive
> Milwaukee, Wis. 53211"

Each bill contained a reference to the particular divorce action as well as a description of the services rendered and the total charge.[2] We note that the first four words

---

"Usually he [Sutton] brought the file over and would go over the file with me; or . . . he'd just come over to my office and say, 'I have this divorce; here's the financial declaration of the wife; the marital state [sic] is thus and so.' And we'd just sit down and discuss it; and then I would proceed to do calculations for taxes, what alimony, if any, that he may have offered or that was offered to his client, the repercussions tax wise, what the net spendable cash of the wife would be versus the husband. And we would just go over—I always went over it with Bob."

[2] Only the bills sent to Sutton in the Klatt, Erdell and Sims cases are contained in the record. These bills read:

"June 29, 1978

> "IN ACCOUNT WITH:  Mr. Robert E. Sutton
> Attorney at Law
> 1409 E. Capitol Drive
> Milwaukee, Wis. 53211
>
> Klatt vs Klatt

"Meeting with your client regarding possible property settlement in divorce action; review of financial declaration of Husband; review of Ajax Metal financial statements; preparation of suggested property division for minimum tax to both parties; review of Stipulation request of Leonard Loeb; preparation of report on same.

in the description of services set forth in the bill sent to Sutton in the Klatt case read, "Meeting with *your* [Sutton's] client . . . ." (Emphasis supplied.) After periods ranging from three to seven months had elapsed and the bills sent to Sutton remained unpaid, Theuerkauf contacted Sutton and reminded him of the outstanding balances due and owing.[3] Shortly after Theuerkauf had sent

"TOTAL SERVICES . . . . . . . . . $350.00"

"March 14, 1978

"IN ACCOUNT WITH: Mr. Robert E. Sutton
Attorney at Law
1409 E. Capitol Drive
Milwaukee, Wis. 53211

Erdell vs. Erdell

"Calculations made to determine tax effect of proposed property and support settlement in Erdell vs. Erdell; testimony regarding same in Waukesha County Court.

"TOTAL SERVICES RENDERED . . . . . $500.00"

"October 4, 1977

"IN ACCOUNT WITH: Mr. Robert E. Sutton
Attorney at Law
1409 E. Capitol Drive
Milwaukee, Wis. 53211

Sims vs Sims

"Review of financial declaration in Sims vs. Sims; submission of recommendation for division of property.

"TOTAL SERVICES . . . . . . . . . $50.00"

[3] The services provided in the Sims case were performed on April 20th and June 7, 1977, and the initial bill was sent on October 4, 1977, with reminders sent on February 27th, June 26th and December 11, 1978, and February 5, 1979. The services provided in the Klatt case were performed on December 22, 1977, and January 5th and March 7, 1978, and the initial bill was sent on June 29, 1978, with a single reminder sent on February 5, 1979. The services provided in the Erdell case were performed on January 14, 21, 22 and 28, 1978, and the initial bill was sent on March 14, 1978,

Sutton a third reminder of the bill for services rendered in connection with the Erdell case, he (Theuerkauf) received Erdell's personal check for $100 in payment for the same, but Theuerkauf, at trial, did not remember whether the check was sent directly to him or forwarded through Sutton. There is no evidence in the record indicating that Theuerkauf ever sent his bills or reminders for the services rendered in any of the divorce cases to any of Sutton's clients. When Theuerkauf failed to receive any other payments on the open accounts, he phoned Sutton some four to six weeks before the commencement of the suit, and requested payment. He recited during this phone conversation that Sutton denied liability for his fees. This was the first time Sutton ever disclaimed responsibility for the costs of Theuerkauf's services in the five years that Theuerkauf dealt with him on the same type of contractual relationship. Theuerkauf to date has never received any payment for the services provided in the Klatt and Sims cases.

Theuerkauf testified that there was never an express (written or oral) agreement between Sutton and himself regarding the payment of his fees, but he did recite that he had discussed his fees with Sutton "in the previous divorces that I did for him and in which I sent [him] my bill and I got paid." Because of his "prior experience [dealings] with Mr. Sutton," he (Theuerkauf) related that he never saw a need to enter into a "contractual signature-type contract" with either Sutton, Erdell, Sims or Klatt regarding the payment of his fees and thus never discussed fees with Sutton's divorce clients. Theuerkauf further testified he never met Sims, although he did have contact with Klatt and Erdell after Sutton had engaged him to prepare the property divisions in those cases and he regarded Sutton as his client

with reminders sent on June 29 and December 11, 1978, and February 5, 1979.

rather than the divorce litigants. The plaintiff, Theuerkauf, stated he was unaware of and did not know who had paid him, Sutton or his clients, in the previous divorce cases, as his secretary handled the posting of payments to his accounts, but we again note that the bills in these cases, as in all the divorce cases, were sent only to Sutton.

Sutton, the only other witness to testify at the trial, stated that he had "referred" a number of his divorce clients, including Klatt, Sims and Erdell, to Theuerkauf and that Theuerkauf did in fact prepare suggested property divisions for him in each case. Sutton also recited that he relied on Theuerkauf's work in his divorce negotiations, but that he never expressly agreed to be personally liable for the services rendered. Sutton further stated that it was his standard practice to send the bills received from Theuerkauf to his divorce clients and when the clients sent him a check he would either forward the check to Theuerkauf or make out his own check in payment of Theuerkauf's services. He failed to explain at trial why, in some instances, he sent his own check to Theuerkauf rather than his client's. It should also be noted that during the course of the trial, Sutton's counsel stipulated that Theuerkauf charged a reasonable fee for his services.

At the close of the testimony, Sutton's counsel argued that the plaintiff had failed to establish an express contract as both witnesses testified that Sutton never stated he would personally pay for Theuerkauf's services. He further contended that the one-year and suretyship provisions of the Statute of Frauds barred enforcement of any contract that could be found from the circumstances of the transactions as there was no written evidence thereof.

Counsel for Theuerkauf argued that the circumstances surrounding the relationship between the parties, in-

cluding the fact that Sutton personally requested the accounting services and that all of Theuerkauf's bills, including those in dispute, were sent only to Sutton and the parties' practice and procedure establish that Sutton, through the course of dealings, had agreed to pay for Theuerkauf's services. He contended that the cited provisions of the Statute of Frauds were inapplicable because the agreement was capable of performance within a year.

Following the arguments, the trial court rendered judgment from the bench dismissing the action on the ground that the plaintiff, Theuerkauf, failed to carry his burden of establishing that "there was a contract between Mr. Roy Theuerkauf and Mr. Sutton by which Mr. Sutton made himself responsible for these costs [accounting services in the three divorce cases involved]." The court failed to recite specific findings of fact or conclusions of law in support of the judgment, but it should be noted that the trial judge stated there was clearly no question as to the credibility of the witnesses (Theuerkauf and Sutton) and concluded, "What we have is a misunderstanding; and, so, we have to look elsewhere than to the credibility of the witnesses."

Theuerkauf appealed the circuit court's judgment to the court of appeals and the appellate court reversed the trial court, holding that the great weight and clear preponderance of the evidence established the existence of an implied in fact contract between Sutton and Theuerkauf in that Sutton had agreed to be personally liable for the costs of the accounting services. The appellate court reasoned that given the course of dealing between the parties, Sutton's silence upon receipt of the bills captioned in his name and the fact that in the usual course of legal associations between attorneys and clients, the attorneys, and not the clients, assume the dominant role in the conduct of the litigation, Sutton could not have

escaped liability in this case unless he made a clear and unequivocal denial of responsibility either at the time the accounting services were originally requested or at the time he received Theuerkauf's bills.

Before this court, it is undisputed that Theuerkauf rendered the accounting services in each of the divorce cases at issue, and there is no challenge to either the adequacy of the services or the amounts charged therefor. The central issue presented for our consideration is whether the facts in this case establish the existence of an implied contract in fact between Sutton and Theuerkauf whereby Sutton agreed to be personally liable for Theuerkauf's fees for the work performed in the Klatt, Sims and Erdell cases.

One of the leading cases in this state on implied in fact contracts is *Wojahn v. National Union Bank,* 144 Wis. 646, 129 N.W. 1068 (1911). *Wojahn* involved a claim by the plaintiff against the National Union Bank for services performed in supervising the affairs of one of the bank's debtors. The supervisory services were performed at the request of an authorized officer of the bank who engaged the plaintiff's services and were of value to the defendant bank. The plaintiff did not submit a bill for his services to the defendant, nor did he make any claim against or demand payment from the defendant until the action was commenced. The plaintiff alleged that the defendant was liable for the reasonable value of his services on the theory of an implied in fact contract. The court stated:

"In this case we are dealing with the subject of implied contracts [in fact] . . . Such a contract requires, the same as an express contract, the element of mutual meeting of minds and of intention to contract. The two species differ only in methods of proof. One is established by proof of expression of intention, the other by proof of circumstances from which the intention is im-

plied as matter of fact. The implication arises upon legal principles and is conclusive in the absence of something efficiently displacing it, as a presumption of law. Unlike the latter, it being an implication of fact though springing into existence as matter of law, it is rebuttable. 15 Am. & Eng. Ency. of Law (2d ed.) 1078.

"The general rule is that if a person performs valuable services for another at that other's request, the law implies, as matter of fact, the making of a promise by the latter and acceptance thereof by the former to pay the one performing the service the reasonable value thereof. *Wheeler v. Hall*, 41 Wis. 447; *Kelly v. Houghton*, 59 Wis. 400, 18 N.W. 326; *Link v. C. & N.W.R. Co.*, 80 Wis. 304, 50 N.W. 335 . . . ." *Wojahn, supra* at 667.

The essence of an implied in fact contract is that it arises from an agreement circumstantially proved. *Kramer v. Hayward,* 57 Wis.2d 302, 306–07, 203 N.W.2d 871 (1973); *Gerovac v. Hribar Trucking Co., Inc.,* 43 Wis.2d 328, 332, 168 N.W.2d 863 (1969). In *Kramer, supra,* the plaintiff suffered substantial fire damage to his property destroying his supper club and bowling alley located in the town of Hayward. The town of Hayward had no fire department and the city of Hayward fire department refused to respond to the plaintiff's call. The plaintiff brought suit against the city and town of Hayward claiming that as a result of the failure of the city and town to provide fire protection, his damages were far in excess of what they otherwise would have been. One of Kramer's theories of recovery was that the city of Hayward had in fact impliedly contracted to provide fire protection for the town of Hayward. The trial court, reviewing the minutes of the city council meetings, stated that the course of dealings between the city and town concerning fire protection " 'negates any mutual intention for the city to furnish blanket fire protection for the town . . . [T]here is no evidence to show any promise by the city to respond when called.' " *Id.* at 306. This court agreed with the trial court, stating:

"A contract implied in fact may arise from an agreement circumstantially proved, but even an implied [in fact] contract must arise under circumstances which show a mutual intention to contract. The minds of the parties must meet on the same thing. Here they did not meet, and the mutual intent or shared understanding which is an essential element of any contract is lacking. . . ." *Id.* at 306–07.

In *Gerovac, supra,* this court commented on implied in fact contracts as follows:

"[A] contract implied in fact may arise from an agreement circumstantially proved. But even an implied [in fact] contract must be one which arises under circumstances which, *according to ordinary course of dealing and common understanding of men, show a mutual intention to contract.*" (Emphasis supplied.) *Id.* at 322.

Thus:

"[a] contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction." (citation omitted). *Erickson v. Goodell Oil Co., Inc.,* 384 Mich. 207, 212, 180 N.W.2d 798 (1970).

Therefore, the rule of *Wojahn, supra,* is that when a plaintiff seeking to recover on the theory of an implied in fact contract establishes that (1) the defendant requested him to perform services, (2) he complied with the request, and (3) the services were valuable to the defendant, the plaintiff has established a *prima facie* case of the existence of a promise on the part of the defendant to pay the plaintiff for the reasonable value of the services, for, according to the ordinary course of dealing and common understanding of men, the existence of such facts establish a rebuttable presumption that the parties mutually intended fair payment. If the defend-

ant is to avoid liability, he must come forward with evidence sufficient to rebut and overcome the presumption of the existence of an implied contract in fact, including a mutual intent on the part of the parties to pay the plaintiff the reasonable value of the services performed. The ultimate and dispositive inquiry is that an implied in fact contract is not conclusively proved unless it is shown that the parties, by their words, their conduct, or course of dealing, came to a mutual agreement and this determination in turn depends upon an objective assessment of the parties' external expressions of intention as distinguished from their undisclosed intentions. Restatement (Second) of Contracts, §2 Comment *b* and §228, (Drafts No. 1, 1964, and No. 5, 1970, approved 1979).[4] An alleged promisor manifests an intent

[4] Sec. 2 Comment *b* of the Restatement provides in part:

"b. *Manifestation of intention.* Many contract disputes arise because different people attach different meanings to the same words and conduct. The phrase 'manifestation of intention' adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention . . . ."

Sec. 228 of the Restatement provides in part:

"(1) Words and other conduct are interpreted in the light of all the circumstances, . . .

"(4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

"(5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade."

The entire Restatement (Second) of Contracts was approved in May of 1979, but the final version has not yet been published as it is undergoing editing for publication. Farnsworth, *Ingredients in the Redaction of the Restatement (Second) of Contracts*, 81 Colum. L. Rev. 1, 4 (1981). It should be noted that the section

if he knows or has reason to know[5] the promisee will infer a particular intention from his conduct. *Id.* at §2, Comment *b* and §21(2).

Applying *Wojahn* to the facts in this case, we find that the uncontradicted and credible[6] evidence demonstrates that Theuerkauf proved a *prima facie* case of the existence of an implied in fact contract as Theuerkauf testified he performed the accounting services specifically at Sutton's request and Sutton agreed that the property divisions were of value to him and that he relied on them in his divorce litigations. Thus, under *Wojahn, supra,* it became Sutton's burden to come forward with evidence sufficient to rebut and overcome the presumption that he, Sutton, promised to pay the reasonable value of Theuerkauf's services.

Sutton contends that he met his burden of going forward by showing it was known to Theuerkauf that he was an attorney and that the services requested were for his known divorce clients, Klatt, Sims and Erdell. Sutton's claim involves the general rule of agency that

numbers of the drafts cited in this opinion may not correspond to the section numbers in the final product as the sections of the tentative draft have been arranged in a revised order. *Id.*

[5] The Restatement (Second) of Contracts defines reason to know as follows:

"*b.* '*Reason to know.*' A person has reason to know a fact, . . . if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist. A person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference. There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence."

[6] The trial court found there was no question of credibility of the witnesses, Theuerkauf and Sutton.

unless otherwise agreed, an authorized agent[7] for a disclosed principal does not become a party to a contract and is thus not personally liable to the other contracting party.

This court has stated the general agency rule relied on by Sutton as follows:

"Ordinarily where the agency is *disclosed,* a plaintiff entitled to recover is entitled to recover against the principal, but not the agent. 2 Corp. Jur. p. 812, §485. The agent is only liable where there is clear and explicit evidence of an intention to substitute or superadd his liability. Id. §487. . . ." *Hooper v. O. M. Corwin Co.,* 199 Wis. 139, 146, 225 N.W. 822 (1929).[8]

We are aware of cases holding that the rules of agency may be applicable to the attorney-client relationship, but they involve fact situations distinguishable from this case. *See: e.g., Ryan v. Department of Taxation,* 242 Wis. 491–496, 8 N.W.2d 393 (1943); *Scand-*

---

[7] There is no claim that Sutton was not authorized to engage the services of a certified public accountant in the divorce cases at issue as he was obliged to evaluate the tax aspects of any divorce stipulation, *Wright v. Wright,* 92 Wis.2d 246, 256, 284 N.W. 2d 894 (1979). Thus, we assume for the purposes of this decision that Sutton was so authorized.

[8] This rule is stated in 3 C.J.S., *Agency,* §365, pp. 180–182 (1973) as follows:

"An agent who contracts on behalf of a disclosed principal and within the scope of his authority, in the absence of an agreement to the contrary, or other circumstances showing that he has expressly or impliedly incurred or intended to incur personal responsibility, *is not personally liable to the other* contracting party, although he may execute the contract in a manner which would otherwise bind him personally, and he need not expressly negative his liability. . . ." (Emphasis supplied.)

A shorthand statement of the rule is set forth in the Restatement (Second) of Agency, §320 (1957) as follows:

"**Principal Disclosed.** Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract."

*rett v. Greenhouse,* 244 Wis. 108, 112, 11 N.W.2d 510 (1943). Thus, we are presented with the question of whether the attorney and the accountant through their course of dealings mutually agreed that Sutton, not his clients, would be personally liable, notwithstanding the fact that Theuerkauf had knowledge that Sutton was an attorney in addition to knowing the names of the divorce litigants. In other words, we must determine what the intentions of Theuerkauf and Sutton were regarding responsibility for the payment for Theuerkauf's services, Sutton or his divorce clients. The disposition of the issue of whether the parties by their conduct and course of dealing manifested a mutual intent to make Sutton personally liable for Theuerkauf's services or, conversely, failed to arrive at such an understanding, involves a consideration of what may reasonably be inferred from the parties' words, conduct and/or course of dealing.

At trial, Theuerkauf and Sutton testified to different subjective intentions as to who was to be liable for Theuerkauf's services: Theuerkauf recited that he intended to hold Sutton personally liable and Sutton stated that it was his intent to have Theuerkauf look solely to the divorce clients for payment. Absent an express agreement covering this issue, we look to the parties "external" manifestations to determine whether their words, conduct and/or course of dealings, together with the pertinent circumstances attending all of their transactions, would, according to the common understanding of men, show a mutual intention to hold Sutton personally liable as principal for Theuerkauf's services.

In the three cases at issue, Theuerkauf pursued a course of action in billing Sutton directly that had proved successful in at least five prior divorce actions over the span of the five preceding years. This course

of action involved the repeated and direct billing to Sutton for the services rendered to his divorce clients. Each bill was labelled "In Account With: Mr. Robert E. Sutton, Attorney at Law" and the bill for the services performed in the Klatt divorce expressly stated "Meeting with *your client* . . ." (emphasis supplied), thus informing Sutton that Theuerkauf regarded Sutton, not the divorce litigants, as his client (Theuerkauf's). After the bills in the cases at issue remained unpaid for a substantial period of time, Theuerkauf contacted only Sutton and reminded him of the outstanding balances. Theuerkauf never had reason to enter into a contract with any of Sutton's divorce clients regarding the payment of his fees as he had always received full payment after billing only Sutton. Thus, Theuerkauf's course of conduct in all of the relevant transactions between Sutton and himself and in the three divorce cases in question is consistent with his intent and viewed objectively, could reasonably convey but one message to Sutton, namely, that Theuerkauf intended to hold Sutton personally liable for the payment of his fees.

On the other hand, Sutton's conduct during the continued course of dealings between the parties included: (1) his repeated and personal requests of Theuerkauf to prepare suggested property divisions; (2) his acceptance of Theuerkauf's bills and subsequent failure to object or protest to being personally billed for Theuerkauf's services as well as to the reference in the Klatt billing to "Meeting with your [Sutton's] client"; and, (3) in some instances, mailing his (Sutton's) personal check to Theuerkauf rather than that of the particular client. According to the course of dealing and the common understanding of men, Sutton's conduct could only be construed as that of a principal rather than an agent in requesting Theuerkauf to perform the accounting

services for his (Sutton's) clients, Klatt, Sims and Erdell. Reviewing the entire contractual relationship between the parties, we conclude that Theuerkauf's function in the eight or more divorce litigations may only be characterized as a tax consultant to Sutton. At Sutton's request and direction, Theuerkauf suggested property divisions that would have minimal tax consequences for the parties. In essence, Theuerkauf was performing a service that Sutton, as the divorce attorney, was under a professional obligation to perform. In *Wright v. Wright*, 92 Wis.2d 246, 256, 284 N.W.2d 894 (1979), we stated "Counsel when entering into a divorce stipulation has a duty to consider tax consequences to his client." *See also: Wetzel v. Wetzel*, 35 Wis.2d 103, 110, 150 N.W.2d 482 (1967), where this court imposed a duty on judges in contested divorces to consider the tax consequences of property divisions in the following language:

"We think in making a division of property or in granting alimony or both that consideration should be given to the tax consequences. Disregarding the effect of taxes may result in an unrealistic and unjust result. We do not hold the trial court must adopt as a solution a method which produces the least amount of tax for the husband or for the wife, but in arriving at a determination of the business side of the divorce the tax impact is a consideration which permeates the whole process." (Citations omitted.)

Since attorneys have the duty and responsibility to inform the court as to the applicable law, it follows that they must also inform the court of the tax consequences of proposed property divisions in contested divorces in order that the trial court may properly discharge its duty to consider such tax implications.

In addition to the foregoing, we note that it is customary in this state for the purveyors of services of

the type involved (tax accounting) as well as engineers, economists, architects, doctors and other expert witnesses used in the conduct of litigation to rely on the lawyer's credit, not the client's, in rendering their services. Indeed, counsel for Sutton admitted as much during oral argument.[9] Sutton, as a practicing attorney in this state for some 15 years (1963) had reason to know of the practice and custom of experts in this state to look to the attorneys who engaged their services for payment unless there was an express disclaimer of responsibility. Further, we conclude that Theuerkauf agreed to perform the services on the strength of Sutton's prior course of conduct and thus extended credit solely to Sutton, not his clients, as an opposite conclusion would be contrary to common sense and the usual course of business dealings since Theuerkauf knew nothing as to the divorce litigants' financial responsibility for, at most they were only names to Theuerkauf at the time the services were requested. In fact, in one instance, Theuerkauf never met Sutton's client (Sims).

Thus, considering the conduct and course of dealing of the parties from 1974 through 1978, wherein Theuerkauf billed only Sutton for his services and Sutton failed to protest or object to this procedure, together with the custom in this state that in the absence of notice to the contrary, experts who perform services in aid of litigation look to the attorneys for payment and rely

[9] The following colloquy took place during the oral argument of Sutton's counsel:

*"Chief Justice Beilfuss:* Don't expert witnesses rely upon their evaluation of the collectibility of, in this case, the lawyer rather than the client. These experts have either by experience or reputation known that lawyers guarantee payment for their services. Isn't that the custom that has grown up in this state?

*"Counsel:* I think in some instances if you examine the triangle of relationship solely from the view of the service providers, the candid answer to that question would have to be yes."

solely on the attorneys' credit rather than the particular client's, we conclude that the only reasonable inference that could be drawn from the evidence in this case is that Sutton engaged Theuerkauf's services as principal rather than agent and that Sutton had reason to know Theuerkauf intended to look to him (Sutton) for payment. Given the course of dealings between Sutton and Theuerkauf and the custom that experts look to attorneys for payment for their services, in the absence of a disclaimer, it would be unreasonable as a matter of law to infer that Sutton's disclosure of his client's names and the fact that he was acting as an attorney gave Theuerkauf reason to know or notice that Sutton was acting as an agent on behalf of the divorce clients when he engaged Theuerkauf's services. At trial, the direct and cross-examination failed to reveal any proof that Theuerkauf knew or had reason to know of the agency principle relied on by Sutton. Thus, Sutton failed to adduce evidence sufficient to rebut the factual presumption that when he requested Theuerkauf to perform accounting services which were of value to him, he also obligated himself to pay Theuerkauf the reasonable value of the services for, under the facts of this case, only an express disclaimer of responsibility would rebut that presumption. Further, we note that the attorney-client relationship differs significantly from the usual business relationship between principal and agent, as an attorney in the litigation area, in contrast to other agents, is not a mere subordinate to the principal (client), for he, not the client, has complete charge of the litigation and decides the necessity for experts and engages the services of those whom he determines to be the most qualified in the interest of his client. Therefore, we agree with the court of appeals that the trial court erred in dismissing Theuerkauf's claim and hold that the only reasonable inference that can be

drawn from the evidence is that Theuerkauf and Sutton, by their words, conduct and course of dealing, manifested a mutual intent to hold Sutton personally liable as principal for the costs of Theuerkauf's services.

The question of an attorney's personal liability for services obtained in aid of litigation for a named client absent an express agreement covering the subject has been considered in other jurisdictions, and there exists a split of authority as to the proper resolution of this issue. *See generally:* Annot. 15 ALR3d 531 (1967). Some jurisdictions refuse to hold the attorney personally responsible. The decisions of these courts are premised upon an inflexible application of the general agency rule that an agent (attorney) who is acting for a disclosed principal (named client) should not be liable for services contracted on behalf of the principal (client). *See: e.g., Neal v. Ardoin,* 594 S.W.2d 145 (Tex. Civ. App. 1979) ; *McCorkle v. Weinstein,* 50 Ill. App.3d 661, 365 N.E.2d 953 (1977). *See also:* Annot., *supra* §3, pp 536–38; 7A C.J.S., Attorney & Client, §140 (1980).

Other jurisdictions have reasoned that an attorney requesting goods or services in connection with litigation is to be treated as principal and held personally liable for the expense of the same absent an express disclaimer of responsibility. The rationale underlying the rule requiring an express disclaimer of liability is that the attorney-client relationship differs significantly from a general agency in that it is subject to the established code of professional responsibility governing the members of the Bar, *See:* SCR ch. 20 and the attorney not the client is in charge of the litigation and determines what services are needed to promote the best interests of the client. This rationale was perhaps best expressed in *Judd & Detweiler v. Gittings,* 43 App. D.C. 304, 310

(1915), wherein the court of appeals for the District of Columbia stated:

". . . While it is true that an attorney is the agent of his client, the relation between them, we think, is such that it calls for some modification of the general rule which the law recognizes as existing between principal and agent. In ordinary transactions, the agent is subordinate to the principal, the principal standing out as the real actor, and the agent merely as a subordinate representative. But the relation between attorney and client is different. The attorney has complete charge of the litigation, is so recognized by the court, and, as such, dominates in all matters pertaining to the conduct of the litigation. 'While in one sense the client is the principal and the attorney the agent, and while the attorney is professionally and constantly acting for clients, whose names from the records of the courts and other means of publicity are almost always known or may be so, yet there are peculiarities in his case which make it necessary to apply to it with some qualification the general principles of agency. In most cases of agency the principal is what the name imports,—the leading person in the transaction. The agent is, as the term implies, a mere subordinate, important only as the representative of the principal; often representing only one principal. An attorney at law, on the other hand, occupies a position of recognized importance in itself, not infrequently of great prominence before the public, in which he often has a large number of clients, his relations to whom are full of detail, and who are little noticed by the public.' *Heath v. Bates*, 49 Conn. 342, 44 Am. Rep. 234. The attorney usually determines what steps are to be taken in his client's interest, and the acts of the attorney in the conduct of litigation are binding upon the client. We therefore deem the just and equitable rule of law thus established to be that, in the absence of express notice to the contrary, court officials and persons connected, either directly or indirectly, with the progress of the litigation, may safely regard themselves as dealing with the attorney, instead of with the client."

For similar statements, *see: Molezzo Reporters v. Patt,* 94 Nev. 540, 542, 579 P.2d 1243 (1978) ; *Burt v. Gahan,*

351 Mass. 340, 342–43, 220 N.E.2d 817 (1966); *Monick v. Melnicoff,* 144 A.2d 381 (D.C. 1958).

We find the rationale underlying the disclaimer rule expressed in *Judd & Detweiler, supra,* compelling and accordingly, we hold that when an attorney engages experts such as but not limited to accountants, economists, engineers, architects and doctors, etc., to perform services in aid of the conduct of litigation for a named client, the law will consider the attorney as principal and will imply a promise on the part of the attorney to pay the reasonable cost and expenses of the expert in the absence of an express disclaimer of liability. In order to avoid liability for the services, the attorney must make an express disclaimer thereof clearly specifying that the attorney is contracting only on behalf of the named or disclosed client and is not personally obligated for the payment of such services. As noted in *Burt v. Gahan, supra* at 343 "[t]here is no hardship in this rule we adopt, as it would be a simple matter for the attorney to exclude himself from liability by a statement to that effect." We hold this rule of law shall also apply prospectively.

At oral argument, Sutton's counsel asserted that adoption of the disclaimer rule or the imposition of liability on Sutton for Theuerkauf's services would promote the violation of SCR 20.26(2) (1980), of the Code of Professional Responsibility entitled "Avoiding acquisition of interest in litigation," that provides:

"While representing a client in connection with contemplated or pending litigation, a lawyer may not advance or guarantee financial assistance to the client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination and costs of obtaining and presenting evidence, provided the client remains ultimately liable for those expenses."

The Supreme Court Rule applies to the attorney-client relationship and does not address the propriety of any agreement between an attorney and those whose services he employs in aid of litigation. The rule specifically allows the attorney to advance expenses of litigation including those for investigation and the only restriction is that the client remains ultimately responsible. Theuerkauf's services in this case may properly be characterized as expenses of investigation as it was Sutton's personal, professional duty to investigate and consider the tax consequences in the respective divorce actions. *See: Wright, supra.*

Sutton's final claim is that the Statute of Frauds bars enforcement of the implied in fact contract. He argues that the agreement falls within the one-year and suretyship provisions of the statute.[10]

At trial, the parties stipulated that the $800 sought in this action was a reasonable value of the services rendered. "However, where a party has rendered services to another, even though it is under an invalid and unenforceable contract, [rendered so by the statute of frauds] he may recover for those services upon *quantum meruit,* upon an implied promise of the defendant to pay the reasonable value of the services." (Citations omitted.) *Mead v. Ringling,* 266 Wis. 523, 528, 64 N.W. 2d 222, 65 N.W.2d 35 (1954). It is apparent therefore that the Statute of Frauds is no impediment to recovery of a judgment for $800 in this case.

---

[10] Sec. 241.02, Stats., provides in part:

"**Agreements, what must be written.** In the following case every agreement shall be void unless such agreement or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith:

"(1) Every agreement that by its terms is not to be performed within one year from the making thereof.

"(2) Every special promise to answer for the debt, default or miscarriage of another person."

*By the Court.*—The decision of the court of appeals is affirmed and the case is remanded to the circuit court for proceedings consistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. *(concurring).* I write separately to emphasize that under the Code of Professional Responsibility the ultimate liability for expenses of litigation remains with the client, SCR 20.26 (2), and the ultimate authority and responsibility for decision making remain with the client, not the lawyer, SCR 20.34(2)(d), (e), (f).