UNIEK, INC., Plaintiff,

v.

**DOLLAR GENERAL CORPORATION, Defendant.**

No. 06–C–311–C.

United States District Court, W.D. Wisconsin.

June 18, 2007.

Kendall W. Harrison, La Follette, Godfrey & Kahn, S.C., Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

For a number of years, defendant Dollar General Corporation sold in its stores picture frames it had purchased from plaintiff Uniek, Inc. When defendant decided to go with another supplier after plaintiff had ordered and manufactured millions of dollars worth of frames for defendant, plaintiff brought this case, asserting claims for breach of contract, promissory estoppel, quantum meruit and a violation of Wis. Stat. § 100.18. The parties are of diverse citizenship and the amount in controversy is greater than $75,000, making the exercise of jurisdiction appropriate under 28 U.S.C. § 1332.

Defendant filed a motion for partial summary judgment with respect to plaintiff's statutory claim, which I granted. *Uniek, Inc. v. Dollar General Corp.*, 474 F.Supp.2d 1034 (W.D.Wis.2007). Now the parties have filed cross motions for summary judgment. (Although defendant labels its motion as one for summary judgment, it is actually another motion for partial summary judgment because defendant has not sought dismissal of plaintiff's promissory estoppel claim.)

Because I agree with defendant that plaintiff has not adduced sufficient evidence to require a trial on its claims for breach of contract and quantum meruit, I will grant defendant's motion for partial summary judgment. Further, because plaintiff has failed to show that no reasonable jury could find in favor of defendant on plaintiff's promissory estoppel claim, I will deny plaintiff's motion for summary judgment.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed.

## UNDISPUTED FACTS

Plaintiff Uniek, Inc. manufactures, distributes and supplies picture frames to high volume retailers located in North America. Defendant Dollar General Corporation operates more than 8,000 convenience stores across the country. Plaintiff's state of incorporation and the location of

its principal place of business is Wisconsin; defendant's are Tennessee.

Between 2000 and 2004, defendant purchased picture frames from seven or eight different vendors, one of which was plaintiff. In late 2004, defendant's divisional merchandise manager, Cindy Mazza, informed plaintiff that defendant was searching for an exclusive vendor and wanted each of its current vendors to propose its "vision" for defendant's 2005 "planogram," which would run from May 16, 2005 through May 15, 2006. A planogram is "a diagram of fixtures and products that illustrates how and where retail products should be displayed, usually on a store shelf in order to increase customer purchases"; it assigns a "specific amount of space ... to specific items in the store." Plaintiff made a presentation to defendant, after which defendant's picture frame buyers told plaintiff that it would be defendant's exclusive domestic picture frame supplier in 2005.

In January 2005, plaintiff and defendant "worked on" a sales forecast for the 2005 retail year. The same month, John Kuypers (plaintiff's senior vice president of sales), Nanette Bolek (one of defendant's buyers), Kevin Easton (defendant's vice president of merchandising, home and apparel) and Cindy Mazza (defendant's divisional merchandise manager) signed a document titled "Uniek/Dollar General 2005 Planogram Agreement Letter of Understanding," which was drafted by plaintiff. In addition, the document was "approved" by defendant's president of merchandising and supply chain.

The document includes the following language:

Uniek Inc. will supply Dollar General an 8 ft planogram to roll out [at] the end of April 2005 to approximately 7,340 stores and all seven DC's. The program will begin as a domestic program distributed from Uniek's warehouses in Waunakee, WI. The change to a direct import program will be determined by Uniek and Dollar General following setting all stores with the 2005 planogram.

. . . . .

Uniek agrees to pay for the fixtures upon receiving completed exclusivity to the in line planogram for 12 months based on service performance and product satisfaction with the exception of Dollar General's direct import program consisting of clear acrylic and bent metal frames.

. . . . .

In the event that an item is discontinued, Uniek and Dollar General will work together to liquidate this merchandise on store leve[l] to avoid excess inventory. Uniek is to only carry 30 days of merchandise on hand to supply Dollar General at all times.

The 2005 agreement/letter of understanding was not approved by defendant's in-house legal department either before or after defendant's employees signed the document.

The "change to a direct import program" referred to in the 2005 agreement/letter of understanding never occurred. Rather, all the picture frames were stored in Wisconsin at plaintiff's warehouses, where defendant retrieved them and distributed them to its stores.

Throughout the 2005 "planogram year," (May 2005–May 2006), defendant continuously issued electronic purchase orders to plaintiff and plaintiff shipped the product according to these purchase orders. Plaintiff imported 75–80% of its product for defendant from overseas and manufactured 20–25% of this product in Wisconsin.

In 2005, plaintiff was defendant's sole picture frame supplier; plaintiff's sales to defendant exceeded $12 million. (The parties are not clear whether they are refer-

ring to the 2005 calendar year or the 2005 "planogram year.")

At the end of calendar year 2005, plaintiff and defendant began discussing defendant's picture frame needs for 2006. At a meeting in December 2005, Bolek told plaintiff that defendant wished to continue using plaintiff as the exclusive picture frames supplier for the 2006 retail year. Defendant's vice president decided at the end of 2005 that "Uniek would go forward with some changes to the planogram, minimal changes."

On December 7, 2005, defendant notified plaintiff that it was discontinuing 17 models of picture frames. From December 2005 through June 2006, defendant ordered a total of 514,108 of the discontinued models.

At the end of December 2005, plaintiff produced and disclosed to defendant its sales forecasts for the amount of plaintiff's products it believed defendant would sell from February 2006 to January 2007, totaling approximately $27,000,000. As with the forecasts for the 2005 Planogram, these forecasts included quantity and price projections for the 2006 Planogram.

Melissa Smith was defendant's associate customer service representative and a buyer who handled much day-today contact with plaintiff until her April 2006 resignation. On January 20, 2006, she wrote an email to plaintiff, stating: "We have reviewed our DG inventory and believe we will take the entire quantity that you have on Roma 4x6. Charleston Chestnut 4x6 & 5x7. We will also take an approximate 14 week supply on the others. You will need to be ready to ship the new Gold and Charleston Black to arrive in our DC's by 4/15/06."

On January 30, Smith wrote plaintiff an email that included the following:

Attached are the items that your company has been awarded for the Home Decor 2006 Planogram year. Please take a few minutes to validate the information listed. The details are from the quotes that have been submitted. In many instances there were several revisions so I want to make sure that we have the correct information.

Please review and confirm by tomorrow, Tuesday January 31st that all the information is correct. If we do not receive a confirmation by 5:00 tomorrow we will assume that everything is correct.

A list of items was attached to the email. The list carried over 41 products from 2005, dropped 17 products and added 36 products that were not a part of the 2005 Planogram.

On February 1, 2006, Smith followed up with this email:

Orders will be written on all new items to arrive in the DC by 5/15/06. They will write 1 case pack per store. Back-up orders will be written for 6/6/06. Please have ready a 30 day supply on hand.

Congratulations on all the new business. Let me know if you have any questions. Thanks,

"1 case pack per store" meant that plaintiff would be supplying one case pack of every product to each of defendant's 8100 stores. A "30 day supply" was supposed to be in defendant's distribution centers by May 15 and "back up orders" for more were supposed to be in defendant's distribution centers by June 6. A "back up order" was typically half the original order.

To calculate how much product it needed to order to have a 30–day supply on hand, plaintiff looked to the forecasts it created, defendant's sales history, defendant's item performance and information from its other customers on similar sales history. Mazza, Smith and Sally Stonage (a buyer for defendant) understood that products plaintiff ordered from China would take at

least 30 days to arrive in the United States. Mazza believed it would take 30 to 60 days to ship the products after they were manufactured in China; Smith believed it would take two to three months for plaintiff to get product from China; Stonage believed that it would be "reasonable" for products ordered from overseas to take 90 to 120 days to arrive.

Throughout February of 2006, plaintiff repeatedly inquired about receiving purchase order confirmations from defendant. Defendant told plaintiff to "keep going," that "everything is fine," and that defendant was "finalizing it."

Around this time, Beryl Buley became defendant's new division president of merchandising and supply chain; he took over the management of defendant's "frames program." On March 13, 2006, Kuypers and James Scheyer (plaintiff's president) spoke with Buley over the telephone. Buley told them that he was going to "take a look at" the picture frames program and that he was going to "re-review it." When Scheyer and Kuypers told Buley that the program "was committed," Buley responded that "he would stand by anything that had been committed." On March 17, 2006 and March 21, 2006, plaintiff sent Smith spreadsheets showing due dates for the picture frames on dates from April of 2006 through July of 2006.

On March 30, defendant informed plaintiff it was "going to start the line review process all over again." Also on March 30, defendant ceased requesting and accepting merchandise that plaintiff had manufactured or ordered under the 2005 Planogram. At that time, defendant had ordered approximately $1,400,000 of the $2,500,000 of picture frames that plaintiff had manufactured or ordered.

On April 1, plaintiff advised its overseas frames manufacturers not to ship, make or order any more frames for defendant and to cancel any orders that were placed but not yet fulfilled. On April 7, defendant informed plaintiff that it and the other vendors would be required to present their picture frame programs to defendant in mid-April. On April 18, plaintiff presented its "New Revised 2006 Program" to defendant, after which defendant told plaintiff that a final decision would be made in two weeks. Defendant informed plaintiff on May 15 that it had chosen another vendor.

When Smith learned that defendant had decided to go with another vendor, she was concerned because she knew that plaintiff "already had product made."

From March 13, 2006, through the end of 2006, defendant ordered 2,362,468 units of "existing" or "carry forward" picture frames from plaintiff; defendant ordered $914,901 of picture frames from plaintiff in April 2006, $585,649 in May and $1,100,353 in June. In total, plaintiff's sales to defendant were approximately $6 million in 2006.

As of May 15, 2006, plaintiff had $7.2 million of inventory that it was carrying for sale to defendant. Defendant purchased $1.7 million of this inventory.

A number of plaintiff's employees believe that defendant's new supplier copied plaintiff's frame designs. Kuypers believes that "the program is exactly the same, or more than 50 to 60 percent of it is the same"; Shaw believes that the new supplier's frames "looked almost identical to what we had planned for the new 2006 Planogram." Plaintiff has no intellectual property rights in its picture frame designs.

Throughout 2005 and 2006, defendant purchased all its picture frames from plaintiff through electronic purchase orders. A document titled "Purchase Order Terms and Conditions," which plaintiff had "in its possession," purports to govern all of defendant's electronic purchase orders.

The document includes a Tennessee choice of law provision.

## OPINION

### A. *Choice of Law*

The threshold question is whether Wisconsin or Tennessee law governs this action. Plaintiff says it is Wisconsin law; defendant says Tennessee.

Defendant's position is a little puzzling. The first round of summary judgment focused exclusively on the question whether plaintiff could proceed with its claim under Wis. Stat. § 100.18. Defendant raised several arguments to support its position that plaintiff had no claim under that Wisconsin statute, but the inapplicability of Wisconsin law was not one of them. Of course, if Tennessee law applied to the dispute, any other argument regarding the Wisconsin statute would have been moot. For example, it would not matter whether defendant made statements to "the public" within the meaning of Wis. Stat. § 100.18 if Wisconsin law were irrelevant to the case. Even more inconsistent with defendant's position is its own counterclaim under Wis. Stat. § 100.18, which it continues to assert, even after I concluded in the February 21, 2007 opinion and order (in agreement with defendant) that the parties had the type of relationship that the statute did not protect. Defendant does not adequately explain these discrepancies.

Plaintiff says that defendant's actions show that defendant has waived the application of any law other than Wisconsin's. However, it is not clear whether the proper substantive law to be applied is an issue that a party may "waive" by assuming the application of a different state's law in a previous motion. The ultimate goal of a court is to apply the law correctly, regardless of the parties' positions. There would be little point in continuing to apply a particular state's law erroneously unless doing so was necessary to prevent significant disruption to the proceedings or unfair prejudice to one of the parties. Plaintiff does not suggest that either of these possibilities will occur if I were to conclude that Tennessee law governs the dispute.

■ The question of waiver is academic, however, because I conclude that Wisconsin law controls this dispute. Defendant raises two arguments in support of applying the law of Tennessee, but neither is persuasive. First, it relies on a document called "Purchase Orders Terms and Conditions," which includes a requirement that its purchase orders be interpreted under Tennessee law. That argument is a nonstarter because plaintiff is not seeking to enforce a purchase order; it relies on the 2005 agreement/letter of understanding and on promissory estoppel and quantum meruit in the alternative. Thus, any choice of law provision for a purchase order has no bearing on this case.

■ Second, defendant says that a straightforward choice of law analysis leads to a conclusion that Tennessee law should apply. However, the Wisconsin Supreme Court has held that the law of the forum state should apply unless it is "clear" that the nonforum state's contacts are of "greater significance" than the forum state's, *State Farm Mutual Automobile Insurance Co. v. Gillette*, 2002 WI 31, ¶ 51, 251 Wis.2d 561, 641 N.W.2d 662, a standard that defendant cannot meet. (The parties agree that Wisconsin's choice of law rules apply.) In arguing that Tennessee's contacts are more significant, defendant relies on its own presence in that state: defendant was in Tennessee when it purchased picture frames from plaintiff, it was in Tennessee when the parties engaged in negotiations over the telephone and in writing, etc. But of course, plaintiff was in Wisconsin during those events, so they do not weigh in favor of defendant. In addition, all the picture frames were

manufactured in Wisconsin or shipped there rather than Tennessee. At most, defendant has shown that the two states have equal contacts with the dispute, which, under the *Gillette* standard, means that Wisconsin law controls.

### B. *Breach of Contract*

Plaintiff identifies two contracts that it contends defendant breached: (1) the "Uniek/Dollar General 2005 Planogram Agreement Letter of Understanding"; and (2) an extension of that agreement into 2006. Even plaintiff seems to recognize that these claims are of questionable merit; it devotes only a very few of the 60 pages of its brief in chief to arguments relating to breach of contract. In any event, plaintiff has not adduced sufficient evidence to proceed to trial on either of these claims.

#### 1. *"2005 Planogram Agreement Letter of Understanding"*

Plaintiff says defendant failed to comply with this document in two ways: (1) defendant "has ordered only $1,400,398 of the $2,497,200 of product for the 2005 Planogram"; (2) defendant "has not worked with [plaintiff] to liquidate any inventory [defendant] discontinued from the 2005 Planogram." Dft.'s Br., dkt. # 136, at 41. Defendant raises a number of objections to both of these claims, but I need not consider them all.

■ With respect to the first alleged breach, plaintiff does not explain why $2,500,000 represents an accurate assessment of the product it was supposed to order under the "2005 Planogram." More fundamentally, plaintiff fails to cite any provision of the agreement/letter of understanding that would have required defendant to purchase all of the product for the "2005 Planogram" from plaintiff. Although the "2005 Planogram Agreement Letter of Understanding" does refer to a "planogram" in multiple places, it does not

require defendant to make all its purchases for the "2005 Planogram" from plaintiff or even define what the "planogram" is or what time period it encompasses.

Also, there is a reference to exclusivity, but the document makes it clear that that issue was to be resolved later. Uniek/Dollar General 2005 Planogram Agreement Letter of Understanding, attached to Aff. of Melissa Blair, dkt. # 139, Exh. 14 (". . . *upon receiving* completed exclusivity to the in line planogram") (emphasis added). In the absence of a violation of a specific provision, there is no breach of contract. Plaintiff cannot simply refer to the document generally and say that defendant breached it as a whole.

■ With respect to the second alleged breach, plaintiff does cite a particular provision: "In the event that an item is discontinued, Uniek and Dollar General will work together to liquidate this merchandise on store leve[l] to avoid excess inventory." Defendant says that the phrase "work together" is simply too indefinite to be enforced and I am inclined to agree. *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 178, 557 N.W.2d 67, 75 (1996) ("Vagueness or indefiniteness as to an essential term of the agreement prevents the creation of an enforceable contract."). However, even if I assume that the term is merely ambiguous rather than indefinite, no reasonable interpretation would support a conclusion that defendant had breached this provision.

It is undisputed that when defendant told plaintiff that defendant was discontinuing 17 models of picture frames, defendant nevertheless ordered more than 500,000 of those frames over the next six months. Plaintiff's view is that these continued purchases did not constitute "working together," but its only support for this

position is the fact that defendant did not buy *all* of plaintiff's inventory for these models. "Work together" does not mean "you must buy everything I want you to buy"; rather, it suggests that both sides will make some compromises. Plaintiff makes no effort to show that its remaining inventory is not a result of over-ordering rather than any unreasonableness or bad faith of defendant.

Further, I agree with defendant that the meaning of "work together" must be determined in light of the sentence in the agreement that comes immediately after the one on which plaintiff relies: "Uniek is to only carry 30 days of merchandise on hand to supply Dollar General at all times." *Tempelis v. Aetna Casualty & Surety Co.,* 169 Wis.2d 1, 9, 485 N.W.2d 217 (1992) ("the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole"). This provision suggests that defendant is not responsible for more than 30 days of inventory or perhaps 30 days plus any amount that plaintiff needed to order from overseas in advance to insure a 30–day supply. But plaintiff does not advance any argument or adduce any evidence that its leftover inventory would meet such a standard. Accordingly, defendant's motion for summary judgment will be granted with respect to plaintiff's claim that defendant breached the "2005 Planogram Agreement Letter of Understanding."

*2. Extension of 2005 agreement*

■ The threshold question for this claim is whether the 2005 agreement (to the extent there was one) was extended to 2006, or, more specifically to the "2006 planogram year." The answer is no, for a very simple reason: the parties never communicated their intent to extend or renew the 2005 agreement.

Of course, it is undisputed that the parties never executed a document called "2006 Planogram Agreement Letter of Understanding" or anything remotely similar. Plaintiff is correct that a modification of a contract need not be in writing (at least not always), but as plaintiff itself recognizes, "[t]he acts relied upon to modify a prior contract must be unequivocal in character," *Carnes Co. v. Stone Creek Mechanical, Inc.,* 412 F.3d 845, 853 (7th Cir.2005). Plaintiff has not pointed to any unequivocal actions of the parties to renew or extend the 2005 agreement. In fact, plaintiff fails to point to any document, email or discussion between the parties in which the possibility of modifying the 2005 agreement was even mentioned.

There were discussions between plaintiff's and defendant's employees at the end of 2005 during which defendant's employees communicated an intent to continue a relationship of some sort with plaintiff. But these are a far cry from an unequivocal statement that defendant wished to extend all of the provisions of the 2005 agreement/letter of understanding into 2006. Plaintiff's countless citations to the subjective intentions of various individuals does not help its case because contracts cannot be modified through telepathy; it is the parties' intent as manifested by their conduct that controls, not their secret thoughts. *Metropolitan Ventures, LLC v. GEA Associates,* 2006 WI 71, ¶ 24, 291 Wis.2d 393, 717 N.W.2d 58; *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814 (7th Cir.1987).

*C. Promissory Estoppel*

■ Defendant did not move for summary judgment on this claim, so the only question is whether plaintiff has shown that it is entitled to judgment as a matter of law. (I decline to "par[e] away" certain aspects of the promissory estoppel claim as defendant suggests in its response brief. If defendant believed the promissory estoppel claim was amenable to partial sum-

mary judgment, it should have included that claim in its own motion.) As the parties are well aware, to prevail on its promissory estoppel claim, plaintiff must first prove that defendant made a promise to plaintiff on which defendant should have reasonably expected plaintiff would rely. *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 697–98, 133 N.W.2d 267 (1965). Because this is a question of fact normally reserved for the jury, I may grant summary judgment to plaintiff only if I conclude that no reasonable jury could answer the question in favor of defendant. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir.1994).

It appears to be quite rare that a court rules as a matter of law that the defendant should have expected the plaintiff to rely on a promise the defendant made. In fact, all of the cases plaintiff cites in support of its motion involved an affirmance of a verdict in favor of the plaintiff after a full trial. *Cosgrove v. Bartolotta*, 150 F.3d 729, 733–34 (7th Cir.1998); *Hoffman*, 26 Wis.2d at 697–99, 133 N.W.2d at 274–75; *Seater Construction Co., Inc. v. Rawson Plumbing, Inc.*, 2000 WI App 232, 239 Wis.2d 152, 619 N.W.2d 293;. *See also Werner v. Xerox Corp.*, 732 F.2d 580, 583 (7th Cir.1984) (affirming factfinder's decision after trial); *U.S. Oil Co., Inc. v. Midwest Auto Care Services, Inc.*, 150 Wis.2d 80, 84, 440 N.W.2d 825, 826 (Ct.App.1989) (reversing summary judgment in favor of defendant).

■ I cannot conclude on this record that this one of those rare cases in which a jury would be compelled to find in favor of plaintiff. There is some evidence in the record that supports defendant's position, most notably the fact that the emails on which plaintiff says it relied came from relatively low level employees of defendant. This could support a finding that defendant would not have reasonably expected plaintiff to order millions of dollars worth of product on the basis of those emails. Also, defendant has raised a genuine dispute about whether any of its conduct before January 30, 2006 amounts to an enforceable promise because, until then, plaintiff had not received any specific information from defendant about the frames it wanted for 2006. Accordingly, I will deny plaintiff's motion for summary judgment and allow this claim to proceed to trial.

### D. *Quantum Meruit*

■ Plaintiff seeks to recover the reasonable value of services it allegedly performed for defendant under a theory of quantum meruit, which the Wisconsin Supreme Court recognized in *Theuerkauf v. Sutton*, 102 Wis.2d 176, 306 N.W.2d 651 (1981), and other cases. (Plaintiff does *not* seek to recover under a theory of unjust enrichment for any goods that defendant may have received but did not pay for.) To prevail on this theory, plaintiff must show that (1) defendant requested plaintiff to perform services; (2) plaintiff complied with the request; and (3) the services were valuable to defendant. *Theuerkauf*, 102 Wis.2d at 185, 306 N.W.2d at 658. Plaintiff identifies three services it performed: warehousing, frame design and sales forecasting.

■ Plaintiff's view on the reach of quantum meruit is creative, perhaps a little *too* creative. With respect to warehousing, plaintiff runs into trouble satisfying all of the elements of quantum meruit. First, defendant requested picture frames from plaintiff; it did not request a warehousing service. The cases plaintiff cites involved a direct request for services, not a sale of goods for which a kind of service was involved incidentally. *E.g., Ramsey v. Ellis*, 168 Wis.2d 779, 484 N.W.2d 331 (1992) (real estate firm's request for consultation); *Theuerkauf*, 102 Wis.2d 176,

306 N.W.2d 651 (lawyer's request for expert's services in context of litigation).

Even if I assumed that defendant's request for picture frames necessarily included a request for the "service" of storing those frames until defendant retrieved them, plaintiff has failed to show that this service was valuable to defendant. In its brief, plaintiff says only that it "produced these frames specifically for DG, at its request, and these frames were available for shipment to [defendant] at any point." Plt.'s Br., dkt# 152, at 4. But this is an argument that the warehousing *could have been* valuable to defendant, that is, if defendant had actually wanted the frames, which of course it did not. Plaintiff fails to explain how storing frames that defendant had no interest in retrieving could benefit defendant in any way.

Plaintiff's argument regarding the "frame design" service is even more problematic. Its basic theory is that defendant copied plaintiff's picture frame designs and gave them to its new core supplier in 2006. As an initial matter, I question whether plaintiff has adduced sufficient evidence to prove that defendant did what plaintiff alleges. Plaintiff cites nothing in the record that indicates how or when the new supplier came up with its picture frame designs. Rather, plaintiff's only evidence is its employees' observations that its frames are similar to those made by the new supplier.

 In any event, plaintiff stumbles on the first element of a quantum meruit claim, which is a request from defendant for this service. Plaintiff says: "[Defendant] requested [plaintiff] to supply picture frames to it, so inherent in this request obviously was the fact that [plaintiff] was to design and supply the frames pursuant to [defendant]'s specifications." Plt. Br, dkt. # 152, at 40. But plaintiff cites no evidence that defendant asked plaintiff to design frames according to particular "specifications" or that plaintiff even designed any frames specifically for defendant. It is simply too much of a stretch of the meaning of "requested service" to say that when one company buys another's products, the purchasing company has "inherently" requested each step in making or designing the product and that these steps are a "service" to the purchasing company. Such a view would destroy any distinction between goods and services.

Finally, with respect to the forecasting of defendant's sales, plaintiff fails again to cite any evidence showing that defendant received a benefit from any sales forecast that plaintiff provided. Without such evidence, plaintiff's quantum meruit claim must fail.

### E. *Punitive Damages*

 In its complaint, plaintiff asks for punitive damages. In its motion for partial summary judgment, defendant seeks a ruling from the court that such damages are not recoverable under a theory of breach of contract, promissory estoppel or quantum meruit, at least on the facts of this case. Because plaintiff did not respond to this argument in its response to defendant's motion for summary judgment, I conclude that plaintiff has forfeited any claim for punitive damages. *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir.2007) (failure to oppose operates as waiver).

### ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by plaintiff Uniek, Inc. is DENIED.

2. The motion for partial summary judgment filed by defendant Dollar General Corp. is GRANTED. The case will

proceed to trial on plaintiff's promissory estoppel claim.